IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

In re HEALTHSOUTH CORPORATION       )       Consolidated Case No.
INSURANCE LITIGATION                )       CV-03-BE-1139-S
_____ )
This Document Relates to: All Actions

ENTERED
MAR 16 2004

MEMORANDUM OPINION

This consolidated action involves claims and counterclaims by ten insurance carriers[1]

seeking to rescind coverage or, alternatively, to receive a declaratory judgment that their policies

provide no coverage to HealthSouth Corporation and various of its officers, directors, and

employees who were covered by those policies. Federal Insurance Company ("Federal"),

Executive Risk Indemnity, Inc. ("Executive Risk"),[2] Greenwich Insurance Company

("Greenwich"), and Clarendon America Insurance Company ("Clarendon") also filed suit in the

Circuit Court of Jefferson County, Alabama. *See Federal Insurance Company, et al. v.*

---

[1] The following is a list of insurance carriers who filed rescission claims or counterclaims in this court: Ace American Insurance Company, Zurich American Insurance Company, St. Paul Mercury Insurance Company, Travelers Casualty Insurance Company, Gulf Insurance Company, Continental Casualty Insurance Company, Lumbermens Mutual Insurance Company, Twin City Fire Insurance Company, Royal Insurance Company, and Royal Indemnity Company.

On January 26, 2004, Royal Indemnity Company filed a counterclaim against HealthSouth and several current or former HealthSouth directors, officers, and employees seeking to rescind coverage or alternatively, to receive a declaratory judgment that HealthSouth policies provide no coverage to the plaintiffs in that action. *See John S. Chamberlin v. Royal Indemnity Company*, CV-03-BE-2637-S. However, for reasons explained explicitly in the body of this Memorandum Opinion, the court does not address the issues raised in the *Chamberlin* lawsuit.

The court has deferred the issue of the legal effect of the severability clauses in the Royal Indemnity Stack of policies. *See* January 14, 2004 Order (doc. # 245). Consequently, the issues raised in the motion for partial summary judgment filed by Ace American Insurance Company, an excess carrier to Royal Indemnity, are not addressed in this Memorandum Opinion.

[2] Federal and Executive are referred to collectively in their various briefs as the "Chubb carriers."

1

*HealthSouth Corporation, et al.*, CV-03-2420; and *Greenwich Insurance Company v.*

*HealthSouth Corporation, et al.*, CV-03-3522.  Currently at issue before this court are the

motions for partial summary judgment filed by the following parties who will be alternately

referred to as the "movants" or "insureds": (1) HealthSouth Corporation (doc. # 157); (2) Richard

Scrushy (doc. # 148)[3]; and (3) current or former HealthSouth directors, officers, and employees[4]

(doc. # 150, # 153, # 154, # 156 & # 261).  The movants seek a determination that the

severability clauses in the various primary and excess directors and officers insurance policies[5]

and primary and excess fiduciary responsibility insurance policies[6] issued to HealthSouth

preclude rescission of coverage as to all insureds.

    The carriers in both the state and federal court litigation essentially allege that

HealthSouth used materially false and misleading financial information to procure insurance

coverage, and that the policies are therefore void *ab initio*.  In support of their allegations, they

---

[3] On November 26, 2003, the court stayed all proceedings against defendant Richard Scrushy until the resolution of the criminal charges filed against him in this court.

[4] Specifically, Betsy S. Atkins, Thomas W. Carman, Richard F. Celeste, Patrick A. Foster, Brandon O. Hale, William W. Horton, Jan L. Jones, Russell H. Maddox, Daniel J. Riviere, Larry D. Taylor, Phillip C. Watkins, John S. Chamberlin, C. Sage Givens, Joel C. Gordon, Robert P. May, Charles W. Newhall, Robert E. Thomson, Larry D. Striplin, George H. Strong, Jon F. Hanson, James P. Bennett, Anthony J. Tanner, and Edward M. Crawford.  Defendants Anthony J. Tanner, P. Daryl Brown, Robert E. Thomson, James P. Bennett, and Edwin M. Crawford also filed separate motions for partial summary judgment.  *See* docs. # 153, # 154, # 156, & # 261.

[5] The following is a list of insurance carriers before this court who issued excess directors and officers liability policies excess of the Federal Insurance Company primary policy: St. Paul Mercury Insurance Company, Royal Insurance Company, Zurich American Insurance Company, Twin City Fire Insurance Company, and Lumbermens Mutual Insurance Company.

[6] Travelers Casualty Insurance Company provided a primary fiduciary liability policy issued to the HealthSouth Retirement Investment Plan ("Plan").  Federal Insurance Company and Executive Risk Indemnity Company provided excess fiduciary liability coverage to the Plan.

direct the court's attention to the Securities and Exchange Commission investigation of

HealthSouth's financial filings, and the numerous guilty pleas entered by HealthSouth former

officers and employees who admitted they participated in a scheme to alter the financial reports

of the company to meet Wall Street expectations.[7]  Because the federal and state insurance

lawsuits involve the same insureds, the same legal questions, and will ultimately involve the

same factual matters for discovery, this court has coordinated efforts with Judge Allwin E. Horn

of the Jefferson County Circuit Court in a joint effort to conserve resources and, to the extent

possible, ensure consistent legal determinations.

Numerous lawsuits have been filed against HealthSouth, its officers and directors

alleging, *inter alia*, securities fraud violations.  The first series of securities actions was filed in

1998.[8]  Another series of class action securities fraud cases were filed in August of 2002, and yet

another group of securities fraud cases were filed in the spring of 2003, after the SEC

---

[7] Rebecca Kay Morgan, Kenneth Livesay, Cathy Edwards, Virginia Valentine, Emery Harris, Angela Ayers, Aaron Beam, Malcolm McVay, William T. Owens, Weston L. Smith, and Michael Martin, all of whom have pled guilty, are also parties in this insurance action. During the time period relevant to this case, Owens held various executive positions, including President, Chief Operating Officer, Chief Executive Officer, Executive Vice-President, and Chief Financial Officer.  Similarly, Smith and McVay held various executive positions including Chief Financial Officer, Executive Vice-President, and Treasurer.  Because of the pendency of the criminal suits, all pretrial discovery and any obligation to file responsive pleadings have been stayed as to these individuals pending sentencing in their respective criminal cases. *See* doc. # 68.  This Memorandum Opinion and accompanying Order, therefore, does not directly affect the rights of these individuals.

[8] *See Richard M. Gordon, et. al. v. HealthSouth Corporation  et. al.*, CV-98-2634-S; *Twin Plus LLC, et. al. v. HealthSouth et. al.*, CV-98-BE-2695; *Irene Rigas, et. al. v. HealthSouth Corporation, et. al.*, CV-98-BE-2777-S; *Harry Schipper v. HealthSouth Corporation et. al.*, CV-98-BE-2779; *United Food & Commercial Workers Union Local 100-A Pension Fund v. HealthSouth Corporation et. al.*, CV-98-BE-2828; *Ryan McCormick v, HealthSouth Corporation et. al.*, CV-98-BE-2831; and *Vinod Parikh v. HealthSouth Corporation et. al.*, CV-98-2869-S.  These cases were initially consolidated as *In re HealthSouth Corporation Securities Litigation*, CV-98-BE-2634-S, and have been subsequently consolidated into *In Re HealthSouth Securities Litigation*, CV-03-BE-1500.

investigation became public.  All of these cases were consolidated in this court as *In Re HealthSouth Stockholders Litigation*, CV-03-BE-1501 and *In Re HealthSouth Bondholders Litigation*, CV-03-BE-1502.  Other cases were also filed against HealthSouth during the fall of 2002 and the spring of 2003, including, among others, cases alleging violations of the Employee Retirement Income Security Act, which have been consolidated in this court as *In Re HealthSouth ERISA Litigation*, CV-03-BE-1700-S.  The above-referenced lawsuits implicate coverage under the various policies that the insurance carriers seek to rescind in this action and in the state court action.

In an effort to methodically address the complex issues involved in the HealthSouth insurance litigation, this court, along with Judge Horn, held several strategy meetings with the attorneys for the insurance companies and the insureds.  Although not unanimously well-received, this court and Judge Horn determined that certain legal issues could be addressed prior to extensive and expensive discovery.  The first of these threshold legal issues involves the severability clauses found in the primary insurance policies and the legal effect of these severability clauses on the carriers' rights to rescind the policies at issue in this case. Consequently, the court invited the filing of motions for partial summary judgment addressing that issue.[9]

This matter currently is before the court on the motions for partial summary judgment filed by the insureds seeking a determination that the severability clauses in the various primary policies preclude rescission of coverage as to all insureds under the primary policies and the excess policies that they characterize as "following form" of the primary policies.

---

[9] *See* the court's October 7, 2003 Order (doc. # 140).

4

Specifically, the individual directors and officers request a partial summary judgment that holds: (1) no basis for rescission lies unless the insurer has a written application that corresponds to the precise policy; (2) the primary and excess directors and officers liability policies and the primary and excess fiduciary liability policies, by their express terms, mandate that the question of coverage as to each insured person must be determined separately and subject only to the statements and knowledge of the individual insured; and (3) the policies contractually limit the right of rescission to intentional or knowing fraudulent misrepresentations.[10]  Defendant Scrushy filed a separate motion for partial summary judgment seeking a ruling that the claims for rescission are contractually limited to circumstances involving intentional knowing fraudulent representation by the respective insured.[11]  In its motion for partial summary judgment, HealthSouth seeks a ruling on the same three points asserted by the individual directors and officers, plus the additional determination that the "adverse interest" rule precludes imputation to HealthSouth the personal knowledge of any officer acting for his or her personal gain.[12]

The insurance carriers filed numerous submissions in opposition to these motions, to which the insureds have responded.  The parties have fully briefed the issue.  On February 10, 2004, the court conducted a joint hearing on this issue with Judge Horn, who addressed the issue as it relates to the state court action.

For the reasons stated below, the court concludes that the severability clauses preclude rescission as to all insureds regardless of their involvement in the alleged fraud.  As more

---

[10] *See* Docs. # 150 and # 156.

[11] *See* Doc. # 148.

[12] *See* Doc. # 157.

specifically set out in the conclusion, the motions for partial summary judgment will be granted in part and denied in part.

## I. STATEMENT OF FACTS

The history of HealthSouth Corporation is inextricably linked with the facts germane to the issue currently before this court. HealthSouth was incorporated in 1984 by Richard M. Scrushy and grew to become one of the largest providers of physical therapy services in the world. At various times during its history, HealthSouth was viewed as a darling of Wall Street. However, the guilty pleas entered by former HealthSouth officers and employees indicate that much of HealthSouth's unprecedented growth may have been the result of unprecedented fraud. The first inkling of troubles at HealthSouth occurred in 1998 with the filing of a series of securities fraud lawsuits alleging financial wrongdoings, including the reporting of inflated earnings and insider tradings. The extent of the alleged wrongdoings at HealthSouth began to surface in the spring of 2003 when investigations by the SEC and Department of Justice became public, resulting in numerous civil suits and guilty pleas from eleven former and current HealthSouth officers and employees.[13] In November 2003, an eighty-five count indictment was returned against Mr. Scrushy, to which he pled not guilty.

The primary and excess insurance companies on the risk for various of these claims filed suits seeking rescission and/or a declaration that they owed no coverage to the insureds under their policies. The policies at issue in this case include the Executive Liability and Indemnity Policy issued by Federal Insurance Company and the excess policies on top of that coverage

---

[13] *See supra*, n. 8 (listing civil suits filed against HealthSouth). Also, cases were filed in Delaware state court. Specifically, *In Re HealthSouth Corporation Shareholders Litigation*, Consolidated Case No. 19896 in the Court of Chancery for the State of Delaware.

("directors and officers" or "D&O policies"); and the Fiduciary Liability Policy issued by

Travelers Casualty & Surety Company and the policies excess to it ("fiduciary policies").

Because all of the policies at issue are claims-made policies, the policy years at issue are the

years in which claims were made, 1998, 2002, and 2003, although most carriers seek relief as to

all policies they issued.  Because a different carrier, Royal Indemnity Company, with different

policy language, picked up the coverage for policy year September 2002 to September 2003, that

policy is not addressed in this Memorandum Opinion.

### A. Executive Liability and Indemnity Policies - " D&O" Coverage

### 1. Federal Policy

Beginning in September 1993 and continuing until September 2002, Federal issued

primary insurance policies to HealthSouth providing the company and its directors and officers

with executive liability and indemnification coverage.  On August 29, 2002, HealthSouth

purchased an extended reporting period from Federal and Executive Risk.  According to

Federal's submissions, after 1994, it did not require HealthSouth to submit renewal application

forms.   Unlike some of the other carriers, Federal does not seek to rescind its policies as to all

insureds.  Exactly which insureds are excluded from rescission by Federal has not always been

clear, but according to the opposition brief filed by Federal in the state court proceeding, Federal

is not currently seeking rescission as to Betsy S. Atkins, Thomas W. Carman, Richard F. Celeste,

Patrick A. Foster, Brandon O. Hale, William W. Horton, Russell H. Maddox, Daniel J. Riviere,

Larry D. Taylor, Robert P. May, Robert E. Thomson, Jon F. Hanson, and Edward M. Crawford.

The critical language of the Federal primary policies (for both the 1997-98 and 2001-02

7

policy years) reads:[14]

> Executive Liability Coverage Insuring Clause 1
> The Company shall pay on behalf of each of the **Insured Persons** all **Loss** for which the **Insured Person** is not indemnified by the **Insured Organization** and which the **Insured Person** becomes legally obligated to pay on account of any **Claim** first made against him, individually or otherwise, during the **Policy Period** or, if exercised, during the Extended Reporting Period, for a **Wrongful Act** committed, attempted, or allegedly committed or attempted by such **Insured Person** before or during the **Policy Period.**[15]

> Executive Indemnification Coverage Insuring Clause 2
> The Company shall pay on behalf of the **Insured Organization** all **Loss** for which the **Insured Organization** grants indemnification to each **Insured Person**, as permitted or required by law, which the **Insured Person** has become legally obligated to pay on account of any **Claim** first made against him, individually or otherwise, during the **Policy Period** or, if exercised, during the Extended Reporting Period, for a **Wrongful Act** committed, attempted, or allegedly committed or attempted by such **Insured Person** before or during the **Policy Period.**

Endorsement 8 added the following coverage:

> Insured Organization Coverage
> Insuring Clause 3
> The Company shall pay on behalf of any **Insured Organization** all **Loss** for which it becomes legally obligated to pay on account of any **Claim** first made against it during the **Policy Period** or, if exercised, during the Extended Reporting Period, for a **Wrongful Act** committed, attempted, or allegedly committed or attempted, by any **Insured** before or during the **Policy Period.**

---

[14] Other policy language, of course, such as exclusions and conditions, will be relevant to other issues concerning coverage and the insureds' obligations. However, those issues are not currently before the court.

[15] Terms in bold type for this and other policies quoted in this Opinion are so designated in the respective  policy as terms defined by the policy. The relevant definitions are included in this Opinion.

Definitions:

> **Insured**, either in the singular or plural, means the **Insured Organization** and any **Insured Person.**

> **Insured Person**, either in the singular or plural, means any one or more of those persons designated in Item 6 of the Declarations for this coverage section.

> **Insured Organization** means, collectively, those organizations designated in Item 5 of the Declarations for this coverage section.

Endorsement 8 modified the definition of "Wrongful Act":

**Wrongful Act** means:
> (a) For purposes of coverage under Insuring Clause 1 or 2. . . any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted, by any **Insured Person**, individually or otherwise, in his **Insured Capacity**, or any matter claimed against him solely by reason of his serving in such **Insured Capacity**.

> (b) For purposes of coverage under Insuring Clause 3, any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted by any **Insured** based upon, arising from or in consequence of any **Securities Transaction**.

Endorsement 8 also added the following definition:

> **Securities Transaction** means the purchase or sale of or offer to purchase

or sell, any securities issued by an **Insured Organization**.

17.   *Representations and Severability*

> In granting coverage to any one of the **Insureds**, the Company has relied upon the declarations and statements in the written application for this coverage section and upon any declarations and statements in the original written application submitted to another insurer in respect of the prior coverage incepting as of the Continuity Date set forth in Item 9 of the Declarations for this coverage section.  All such declarations and statements are the

9

basis of such coverage and shall be considered as incorporated in and constituting part of this coverage section.

Such written application(s) for coverage shall be construed as a separate application for coverage by each of the **Insured Persons**. With respect to the declarations and statements contained in such written application(s) for coverage, no statement in the application or knowledge possessed by any **Insured Person** shall be imputed to any other **Insured Person** for the purpose of determining if coverage is available.  (Emphasis added.)

Endorsement No. 8 to the Federal Policies reads in part:

For purposes of coverage under Insuring Clause 3 [Insured Organization Coverage] only, the second paragraph of subsection 17, Representations and Severability, is deleted in its entirety and the following is inserted:

With respect to the declarations and statements contained in the written application(s) for coverage, all declarations and statements contained in such application and knowledge possessed by any Insured Person identified in Item 6 of the Declarations shall be imputed to any Insured Organization for the purpose of determining if coverage is available.

For purposes of coverage under Insuring Clause 3 [Insured Organization Coverage] only, subsection 7, Severability of Exclusions, is deleted in its entirety and the following is inserted:

With respect to the exclusions in subsections 5, 6.1 and 6.2, only facts pertaining to and knowledge possessed by any past, present or future chief financial officer, President or Chairman of any Insured Organization shall be imputed to any Insured Organization to determine if coverage is available for such Insured Organization.

(Emphasis added.)

## 2. Excess Coverage

The following carriers, in order, provided additional layers of coverage above the Federal

D&O coverage ($10,000,000) for the policy year September 1, 1998 - September 1, 1999:[16]

| Insurer | Amount |
| --- | --- |
| *St. Paul Mercury Ins. Co. | $10,000,000 excess of $10,000,000 |
| Federal Ins. Co. | $10,000,000 excess of $20,000,000 |
| *Royal Ins. Co. | $10,000,000 excess of $30,000,000 |
| *Zurich American Ins. Co. | $10,000,000 excess of $40,000,000 |
| Executive Risk Indemnity Inc. | $10,000,000 excess of $50,000,000 |
| *St. Paul Mercury Ins. Co. | $5,000,000 excess of $60,000,000 |
| *Royal Ins. Co. | $10,000,000 excess of $65,000,000 |
| Federal Ins. Co. | $10,000,000 excess of $75,000,000 |
| Executive Risk Indemnity Inc. | $15,000,000 excess of $85,000,000 |
| Lloyds of London | $25,000,000 excess of $100,000,000 |
| Executive Risk Indemnity Inc. | $25,000,000 excess of $125,000,000 |

The coverage excess to Federal ($10,000,000) in policy year September 1, 2001 - September 1, 2002, was as follows:

| Insurer | Amount |
| --- | --- |
| *St. Paul Mercury Ins. Co. | $10,000,000 excess of $10,000,000 |
| Federal Ins. Co. | $10,000,000 excess of $20,000,000 |
| *Royal Ins. Co. | $10,000,000 excess of $30,000,000 |
| *Zurich American Ins. Co. | $10,000,000 excess of $40,000,000 |
| Clarendon American Ins. Co. AIG Europe UK Ltd. | $10,000,000 excess of $50,000,000 |
| *St. Paul Mercury Ins. Co. | $5,000,000 excess of $60,000,000 |
| *Royal Ins. Co. | $10,000,000 excess of $65,000,000 |

---

[16] The carriers identified with an asterisk on this and the following chart are parties in this court.

11

| Greenwich Ins. Co. | $10,000,000 excess of $75,000,000 |
|---|---|
| *Gulf Ins. Co. | $15,000,000 excess of $85,000,000 |
| New Hampshire Ins. Co.<br>Clarendon American Ins. Co.<br>Lloyds of London | $17,500,000 excess of $100,000,000 |
| Great Lakes UK | $15,000,000 excess of $117,500,000 |
| *Twin City Fire Ins. Co. | $10,000,000 excess of $132,500,000 |
| *Lumbermens Mut. Cas. Co. | $17,500,000 excess of $142,500,000 |
| Greenwich Ins. Co. | $40,000,000 excess of $160,000,000 |

The excess policies contain language that provides, in essence, that <u>except where stated otherwise</u>, the excess policy is subject to the same terms, conditions, limitations, and other provisions contained in the primary policy and any underlying excess policies. Most of the excess policies similarly state that the coverage shall not be broader than would be provided by any underlying insurance.[17] None of the excess policies contain severability clauses, nor make any reference to the representations and severability clause found at paragraph 17 of the Federal policy quoted above.

The most strikingly different language in any excess policy is found in the Zurich policy, which provided the fourth layer of coverage in both the 1998-99 and 2001-02 policy years at issue. The 1998 policy provides:

---

[17] For example, the Zurich policy reads:

> <u>Except as otherwise provided herein</u>, coverage under this policy shall then apply in conformance with and subject to the warranties, limitations, conditions, provisions, and other terms of the **Primary Policy** as in effect the first day of the Policy Period, together with the warranties and limitations of any other **Underlying Insurance**. In no event shall coverage under this policy be broader than coverage under any **Underlying Insurance**. (Emphasis added.)

12

> In consideration of the payment of the premiums and <u>in reliance upon all statements made and information furnished to Zurich</u> American Insurance Company (hereinafter called the Underwriter) and to the Insurers of the Underlying Insurance, <u>including the statements made in the application and its attachments and any material submitted therewith</u>, all of which are made a part hereof, and subject to the Declarations and the limitations, conditions, provisions, and other terms of this policy (including any endorsements hereto), the Underwriter, the Parent Company and the Insureds agree . . . . (Emphasis added.)

In the 2001 Zurich policy, the following endorsement was added:

Endorsement No. 3

> In consideration of the premium charged, it is hereby understood and agreed that this policy is issued in <u>reliance upon statements made and materials furnished</u> to the Insurer by the Insured Entity in connection with all Directors and Officers Liability Insurance applications or requests furnished to the Insurer <u>including prior applications or requests, and all statements made and materials incorporated in the following specific documents issued by the Company whether furnished directly to the Insurer or indirectly to the Insurer from public sources available to the Insurer at the time of such request(s)</u>:
>
> 1. The Company's Annual report(s);
> 2. The Company's Quarterly report(s);
> 3. The Company's interim financial statements;
> 4. The Company's proxy statement(s) (or other Notices to Shareholders);
> 5. The Company's indemnification provisions (and contracts, if any).

(Emphasis added.)

The excess carriers above the Zurich level claim the benefit of this added language in the

Zurich policy because of language in their own policies adopting the limitations and

13

endorsements of the policy immediately underlying its own. [18]

### B. Fiduciary Responsibility Insurance Policy

Travelers Casualty & Surety Company of America provided the primary fiduciary

responsibility coverage to HealthSouth.  The policy at issue here covers the policy period from

September 1, 2001 to September 1, 2003.  The policy was issued to the HealthSouth Retirement

Investment Plan as named insured.  The insuring clause of the policy provides:

> **INSURING AGREEMENT.**
> The Company will pay on behalf of the **Insured** all sums which the
> **Insured** shall become legally obligated to pay as **Damages** on
> account of any claim made against the **Insured** for any **Wrongful**
> **Act** and the Company shall have the right and duty to defend such
> claim against the **Insured** seeking such **Damages**, even if any of
> the allegations of the claim are groundless, false or fraudulent, and
> may make such investigation and settlement of any claim as it
> deems expedient. . . .

The policy defines "insured," as relevant here, to include:

> (1) The Trust or Employee Benefit Plan designated in the
> Declarations . . . .
>
> (2) An employer who is the sole sponsor of such Trust or
> Employee Benefit Plan.
>
> (3) Any natural person who at any time holds or shall have held the
> position of:

---

[18] For example, the Clarendon policy reads:

> Except as specifically set forth in the terms, conditions or endorsements
> of this Policy, coverage hereunder shall apply in conformance with the
> terms, conditions, limitations and endorsements of the policy
> immediately underlying this Policy, except that coverage hereunder shall
> attach only after all Underlying Insurance has been exhausted by actual
> payment of claims or losses thereunder.

(Emphasis added)

14

> (a) Trustee of such Trust or Employee Benefit Plan.
> (b) Director, officer or employee of such Trust or Employee
>     Benefit Plan or of such sole sponsor employer.

(4) Any other person or organization designated in the Declarations
as a Fiduciary. . . .

The "Conditions" section, Section XI,  of the policy contains the following provision:

> **8.     Declarations.**
>
> By acceptance of this policy, each **Insured** agrees that the
> statements in the Application attached to this policy are said
> **Insured's** agreements and representations, that this policy is issued
> in reliance upon the truth of such representations and that this
> policy embodies all agreements existing between said **Insured** and
> the Company or any of its agents relating to this Insurance.
> (Emphasis added.)

However, section 8 was amended by the "Severability  Endorsement:"

> By adding to Section XI. **CONDITIONS** (8) the following:
>     No statement in the application or knowledge or
> information possessed by an Insured shall be imputed to any other
> **Insured** for the purpose of determining the availability of coverage
> hereunder.  (Emphasis added)

The application, signed by Kimberly S. McCracken, Retirement Plans Manager, contains

the following provision:

> The undersigned declares that the statements set forth herein are
> true to the best of his or her knowledge and belief.  The
> undersigned agrees that this application and attachments form the
> basis of the contract should a policy be issued and shall be deemed
> attached to and form a part of a policy.  The Company is hereby
> authorized to make any investigation and inquiry in connection
> with this application.  (Emphasis added.)

Federal Insurance Company and Executive Risk Indemnity, Inc. provided excess

15

coverage to supplement Travelers' primary policy.  At the February 10, 2004 oral argument, the parties conceded that the excess policies follow form of Travelers' primary fiduciary liability policy.

**C. Other "Facts"**

Despite the court's earlier instructions that the insurance policies themselves were the only evidence needed to address the purely legal issue of the effect of the severability clauses, most of the carriers insisted upon submission of affidavits and numerous underwriting materials to emphasize the underwriting process and the degree of reliance they placed on various documents purportedly containing misrepresentations.  Some carriers also attempted to support their factual positions concerning the fraudulent "scheme" at HealthSouth that infected the various representations contained in their underwriting materials and, thus, justify rescission. Those factual matters, however, are irrelevant at this stage.

As the court previously told counsel, for the purposes of these motions for partial summary judgment, the court will **assume** the following:[19]

1. Each insurer engaged in some form of underwriting review for the initial issuance of its policy to HealthSouth and for at least some of the subsequent renewals.

2. Each insurer who so alleged received, reviewed, and relied upon publicly available information issued by HealthSouth, as well as information specifically provided to it by

---

[19] In stating these assumptions, the court is well aware that the insureds contest many of these assumptions.  At the appropriate time after discovery, they will have an opportunity to challenge the validity of these assumed facts.  However, for the purpose of these motions, and only for this purpose, the court is accepting these assumed facts.  This assumption is consistent with the standard for considering a Motion for Summary Judgment that requires that the facts be viewed in the light most favorable to the non-moving party.  *See Celotex v. Catrett,* 477 U.S. 317, 327 (1986).

16

HealthSouth, if any.

3.  Each insurer who so stated in its complaint relied upon financial information contained in HealthSouth's SEC filings and other public statements.

4. The financial information in those SEC reports contained false information that was material to the issuance of the policies.

5. The false information in those reports increased the risk assumed by each insurer.

6. Each insurer, as alleged, would not have issued its policy, or policies, to HealthSouth had it known the truth.

These assumed facts, if proven and not defeated by any defenses, would create a *prima facie* case for rescission under Alabama Code § 27-14-7, discussed below, if no provisions in the insurance policies provide otherwise, and if all statutory prerequisites are established. These assumptions may or may not prove true, but they are accepted by the court at this time in considering the specific legal issue before it: the legal effect of the severability clauses on the right of the insurance companies to rescind their policies. Thus, efforts by some insurance companies to raise as "disputed facts" questions regarding what materials were submitted or obtained in making underwriting decisions, and what information was false or relied upon is irrelevant at this point and will not be used to defeat partial summary judgment on the ground of factual issues.

The court specifically finds no dispute as to any material facts relevant to this limited inquiry. The precise language of the insurance policies cannot be disputed and the policies speak for themselves. The question, then, becomes whether the moving parties are entitled to judgment as a matter of law on their motions for partial summary judgment as to the legal effect of the

17

severability clauses.

## II. STANDARD FOR PARTIAL SUMMARY JUDGMENT

The court acknowledges that several insurance companies take exception to the method by which it has chosen to address the various issues involved in this complex litigation. *See, e.g.,* Traveler's Opposition, p. 7 - 10 (doc. # 225), joined in by other carriers.[20]  Travelers maintains, among other things, that the procedure adopted by this court and Judge Horn is not sanctioned by Rule 56 because the decision sought here will not finally dispose of any claim or defense, and would amount to an impermissible advisory opinion. *Id.*

Contrary to Travelers' insinuation, the Eleventh Circuit recognizes the validity of motions for partial summary judgment in such a context as this case. In *Stillman v. Travelers Ins. Co.,* 88 F.3d 911, 913 (11th Cir. 1996), the Eleventh Circuit Court of Appeals approved of a partial summary judgment for the purpose of issue-narrowing. *Stillman* involved an insurance coverage dispute in which Travelers and its insured filed cross motions for summary judgment, in part, on "the legal effect of the pollution exclusion clause." *Id.* at 913.  The Eleventh Circuit upheld the district court's power to enter a partial summary judgment at an early stage of the proceedings and recognized that the result was to narrow the issues. *Id.* at 914 n.4.[21]

---

[20] Travelers' position is apparently adopted by all other Insurers by virtue of footnote 4 on page 4 of Federal's Opposition; page 15 of Zurich American's Opposition; page 1 of Clarendon America's Notice of Joinder; page 1 of Gulf's Opposition; and page 1 of St. Paul's Opposition filed December 17, 2003.

[21] The Eleventh Circuit's interpretation of Rule 56 is consistent with earlier Fifth Circuit precedent, binding on the Eleventh Circuit.  The former Fifth Circuit Court of Appeals stated:

> In cases that involve complicated fact patterns and multiple causes of
> action, summary judgment may be proper as to some causes of action but
> not as to others, or as to some issues but not as to others, or as to some
> parties but not as to others; the necessary predicate for a decision on a

The Eleventh Circuit and the Fifth Circuit have both recognized the trial court's ability to narrow the issues through pre-trial proceedings like those employed here. *See Diaz v. Schwerman Trucking Co.*, 709 F.2d 1371, 1376 n.6 (11th Cir. 1983) (indicating that Rule 16 allows the court to decide issues not subject to material disputes of fact); *Fox v. Taylor Dive & Salvage Co.*, 694 F.2d 1349, 1356-57 (5th Cir. 1983) (holding that "[a] district judge has both discretion and responsibilities to aid in narrowing the issues to be presented at trial. Fed. R. Civ. P. 16. A groundless contention, one in which both the facts and law are to the contrary, need not be heard in the district court.")[22]

---

> summary judgment motion is a sorting out of causes of action and
> defendants.  This may require the court to exercise Job-like patience, . . .

*Barker v. Norman*, 651 F.2d 1107, 1123 (5th Cir. Unit A July 1981).  *See Bonner v. City of Pritchard, Alabama*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

[22] The Advisory Committee Notes to Rule 56 also support the motion of partial summary judgments:

> The partial summary judgment is merely a pretrial adjudication that
> certain issues shall be deemed established for the trial of the case.  This
> adjudication is more nearly akin to the preliminary order under Rule 16
> and likewise serves the purpose of speeding up litigation by eliminating
> before trial matters wherein there is no genuine issue of fact.

Additionally, Rule 16(c) of the *Federal Rules of the Civil Procedure* acknowledges the trial court's inherent power "in the formulation and simplification of the issues, including elimination of frivolous claims or defenses;" the appropriateness and timing of summary adjudication under Rule 56; and the need for adopting special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions. . . . *Id.* at Rule 16(c)(1), (5) and (12).  The Committee Comments to Rule 16 elaborate that Rule 16(c)(1)

> is intended to clarify and confirm the Court's power to identify the
> litigable issues.  It has been added in the hope of promoting efficiency
> and conserving judicial resources by identifying the real issues prior to
> trial, thereby saving time and expense for everyone. . . . The timing of
> any attempt at issue formulation is a matter of judicial discretion. . . .

Moreover, Travelers' suggestion that an order from this court on partial summary judgment would constitute an improper advisory opinion is also unfounded. The United States Constitution merely prohibits advice from a district court on wholly abstract, hypothetical, or collusive lawsuits. *McKusick v. City of Melbourne, Fla.*, 96 F.3d 478, 482 (11th Cir. 1996). A controversy is not abstract, hypothetical, or collusive when a "real and substantial controversy" exists between the parties. *Dixie Elec. Co-op v. Citizens of the State of Alabama*, 789 F.2d 852, 858 (11th Cir. 1986).

Under the facts of this case, a justiciable controversy exists in that the parties disagree on the legal effect of the severability clause on the carriers' rights under Alabama's rescission statute. An order on this issue would not be advisory, but rather an interlocutory adjudication of a very real, present legal dispute. This consolidated case involves a real, concrete, and justiciable controversy in which the parties are genuinely adverse. This court has the authority to direct the parties to brief, and the authority to decide, the legal effect of the severability clause upon the Insurers' right to rescind the policies.[23]

Furthermore, the court's October 7, 2003 Order was consistent with Fed. R. Civ. P. 16 and 26, which explicitly authorizes the district court to adopt special procedures to expedite the settlement or adjudication of potentially difficult or protracted cases.[24] The complexity of this

———————————————

[23] In *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227 (1937), the United States Supreme Court upheld the constitutionality of the Declaratory Judgment Act of 1934, which authorized the bringing of civil actions seeking a declaratory judgment in "cases of actual controversy."

[24] *See, e.g.,* Rule 16(c)(1) ("the formulation and simplification of the issues"); Rule 16(c)(3) ("advance rulings from the court on admissibility of evidence"); Rule 16(c)(5) ("the appropriateness and timing of summary adjudication under Rule 56"); Rule 16(c)(9) ("settlement"); Rule 16(c)(12) ("the need for adopting special procedures for managing potentially difficult or protracted actions that may involve

20

litigation should be apparent.  The court determined that the best way to address this complex case is one issue at a time.  Thus, the court has authority to address at this early stage the purely legal question of the effect of the severability clause on the insurers' right to rescind.

Having determined that it has the authority to rule on the insureds' motions for partial summary judgment, the court next addresses the relevant standard of review.  When a district court reviews a motion for summary judgment under Federal Rule of Civil Procedure 56, it must determine two things: (1) whether any genuine issues of material fact exist; and, if not, (2) whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56 (c).  To succeed, the moving party bears the burden of establishing both prongs of the summary judgment test.  The nonmoving party may defeat the motion for summary judgment by establishing <u>either</u> genuine issues of material fact <u>or</u> that the movant is not entitled to judgment as a matter of law.

Substantive law determines which facts are material and which are irrelevant.  *Anderson,* 477 U.S. at 248.  A dispute raises a genuine issue of fact "only if a reasonable jury considering the evidence presented could find for the nonmoving party."  *Anderson*, 477 U.S. at 249.  Material facts affect the outcome of the trial under governing law.  477 U.S. at 248.  To determine whether a material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party.  *Anderson*, 477 U.S. at 249; *Patton v. Triad Guar. Ins. Corp.,* 277 F.3d 1294, 1296 (11th Cir. 2002); *Witter v. Delta Airlines, Inc.,* 138 F.3d 1366, 1369

---

complex issues, multiple parties, difficult legal questions, or unusual proof problems"); Rule 16(c)(13) ("an order for a separate trial pursuant to Rule 42(b) . . . with respect to any particular issue in the case"); Rule 16(c)(14) ("an order directing a party or parties to present evidence early in the trial with respect to a manageable issue that could, on the evidence, be the basis for a judgment as a matter of law under Rule 50(a) or a judgment on partial findings under Rule 52(c)"; and Rule 16(c)(16) ("such other matters as may facilitate the just, speedy, and inexpensive disposition of the action").

(11th Cir. 1998).

After both parties have addressed the motion for summary judgment, the court must grant

the motion if no genuine issues of material fact exist and if the moving part is entitled to

judgment as a matter of law.  Fed. R. Civ. P. 56 (c).  As previously noted, no genuine issues of

material fact exist, so the question becomes whether the moving parties are entitled to judgment

as a matter of law.

### III.  DISCUSSION

### A.  General Alabama Law on Insurance Contract Construction[25]

Alabama law provides clear guidelines for a court interpreting language in an insurance

policy.  "[I]nsurance contracts, like other contracts, are construed so as to give effect to the

intention of the parties, and, to determine this intent, a court must examine more than an isolated

sentence or term; it must read each phrase in the context of all other provisions."  *Celtic Life Ins.*

*Co. v. McLendon*, 814 So. 2d 222, 224 (Ala. 2001).  In interpreting the language of an insurance

policy, the court must give the words used in the policy their customary and normal meaning, and

the court must construe the policy in a manner consistent with the interpretation that a person of

ordinary intelligence would place on the policy's language.  *Twin City Fire Ins. Co. v. Alfa Mut.*

*Ins. Co.,* 817 So. 2d 687, 692 (Ala. 2001); *Boone v. Safeway Ins. Co. of Ala., Inc.,* 690 So. 2d

404, 406 (Ala. 1997); *Sullivan v. State Farm Auto. Ins. Co.,* 513 So. 2d 992, 994 (Ala. 1987).  If,

_____

[25] Alabama Code § 27-14-22 provides: "All contracts of insurance, the application for which is
taken within this state, shall be deemed to have been made within this state and subject to the laws
thereof."  Also, pursuant to Endorsement No. 4 of the Federal Insurance D&O Policy, "[t]he law of the
jurisdiction most favorable to . . . insurability" controls for the purpose of resolving any dispute between
HealthSouth and the Insurer over insurability, provided that such jurisdiction is where, among other
things, HealthSouth has its principal place of business.  HealthSouth's principal place of business is
located in Birmingham, Alabama.  Further, all parties agree that Alabama law governs.  Thus, Alabama
law controls as to all of the insurance policies at issue.

under this standard, the words used are reasonably certain in their meaning, they are not

ambiguous as a matter of law, and the rule of construction favoring the insured does not apply.

*Bituminous Cas. Corp. v. Harris*, 372 So. 2d 342, 344 (Ala. Civ. App. 1979).  However,

"[w]here there is any doubt or confusion as to the meaning of a term in an insurance policy, the

general rule of contracts applies to the policy, so that the contract is interpreted against the party

which drafted the contract."  *Boone*, 690 So. 2d at 406.  "Any language of an insurance contract

that is susceptible to more than one interpretation must be construed in favor of coverage for the

insured."  *Id.*

As explained by the Alabama Supreme Court, "insurance companies are entitled to have

their policy contracts enforced as written, rather than risking their terms either to judicial

interpretation or the use of straining language, and the fact that different parties contend for

different constructions does not mean that the disputed language is ambiguous."  *Woodall v. Alfa

Mut. Ins. Co.,* 658 So. 2d 369, 371 (Ala. 1995) (quoting *Gregory v. Western World Ins. Co.,* 481

So. 2d 878, 881 (Ala. 1985)).  In the absence of a statutory provision to the contrary, insurance

companies have the right to limit their liability and to write policies with narrow coverage.

*United States Fid. & Guar. Co. v. Bonitz Insulation Co.,* 424 So. 2d 569 (Ala. 1982); *Altiere v.

Blue Cross & Blue Shield of Ala.*, 551 So. 2d 290, 292 (Ala. 1989); *Upton v. Mississippi Valley

Title Ins. Co.,* 469 So. 2d 548, 554 (Ala. 1985).

The Alabama Supreme Court recently emphasized this important canon of construction in

*World Insurance Co. of Am. v. Thomas,* Case No. 1011518, 2003 WL 22272781 *8 (Ala.

October 3, 2003), where it reasoned:

> It has been stated that a contract of insurance, being the law between the parties,
> should have every stipulation construed as written.  It being presumed that every

23

condition was intended to accomplish some purpose, it is not to be considered that idle provisions were inserted. Each word is deemed to have some meaning, and none should be assumed to be superfluous. All portions of a policy should be considered in construing it. Accordingly, a court will attempt to give meaning and effect, if possible, to every word and phrase in the contract in determining the meaning thereof, and a construction which neutralizes any provision of a contract should never be adopted if the contract can be so construed as to give an effect to all of the provisions.

(quoting, Jay Appleman, Insurance Law and Practice, § 7383 (1981)). Thus, courts may not re-write policy language so as to provide coverage that was not intended by the parties. *Am. Nat'l Prop. & Cas. Co. v. Blocker,* 165 F. Supp. 2d 1288, 1295 (S.D. Ala. 2001); *Altiere v. Blue Cross & Blue Shield of Ala.*, 551 So. 2d 290, 292 (Ala. 1989). But "[a] policy must be construed fairly, must effectuate its purpose, and must reflect common sense so as not to bring about an absured result." *Boone,* 690 So. 2d at 406.

In evaluating the policy provisions at issue in this case, the court has been guided by these general principles of construction.

**B. Alabama Law Regarding Rescission**

The insurers claim their policies are void *ab initio* and seek to rescind coverage under the provisions of Alabama Code § 27-14-7, which reads:

> Application for policy – Representations and misrepresentations, etc.
>
> (a)  All statements and descriptions in any application for an insurance policy or annuity contract, or in negotiations therefor, by, or in behalf of, the insured or annuitant shall be deemed to be representations and not warranties. Misrepresentations, omissions, concealment of facts and incorrect statements shall not prevent a recovery under the policy or contract unless either:
>
> (1)  Fraudulent;

(2)    Material either to the acceptance of the risk or to the hazard
       assumed by the insurer; or

(3)    The insurer in good faith would either not have issued the
       policy or contract, or would not have issued a policy or
       contract at the premium rate as applied for, or would not
       have issued a policy or contract in as large an amount or
       would not have provided coverage with respect to the
       hazard resulting in the loss if the true facts had been made
       known to the insurer as required either by the application
       for the policy or contract or otherwise.

Thus, Alabama statutory law provides three alternative grounds for rescission.[26]  An

insurer can rescind a policy or deny coverage if, in the application or "in negotiations therefor,"

the insured made misstatements that either (1) were fraudulent, (i.e., made intentionally with

knowledge); <u>or</u>, (2) were material to the risk (although innocently made); <u>or</u> (3) affected the

insurer's good faith decision to issue the policy for which the insured applied.  *See, State Farm*

*Gen. Ins. Co. v. Oliver*, 658 F. Supp. 1546, 1549 (N.D. Ala. 1987), *aff'd sub nom State Farm*

*Fire & Cas.  Co. v.  Oliver,* 854 F.2d 416 (11th Cir. 1988); *Nat'l Life & Acc. Ins. Co. v. Mixon*,

282 So. 2d 308, 312 (Ala. 1973).

As a general rule, to which exceptions arise, the provisions of § 27-14-7 become a part of

insurance policies issued in Alabama.  *See Gen. Mut. Ins. Co. v. Ginn*, 218 So. 2d 680, 684 (Ala.

1969); *cf. Oliver*, 854 F.2d at 419.  An insurance company cannot include grounds for rescission

in its policy that would provide greater protection for the insurance company than is permitted by

the Alabama rescission statute.  *See Oliver*, 854 F.2d at 419 (citing *Gen. Mut. Is. Co. v. Ginn*,

218 So. 2d 680, 684 (Ala. 1969); *Gen. Accident, Fire & Life Assur. Corp. v. Jordon*, 161 So. 240

---

[26] Although often referred to as the "rescission statute," § 27-14-7 does not mention rescission.
Instead, the statute speaks of "prevent[ing] a recovery under the policy."  Thus, the grounds for rescission
discussed here can also apply to deny coverage under a valid contract of insurance.

(Ala. 1935)).  An insurer, however, can by its policy terms, <u>contractually limit</u> the grounds for rescission to a standard that allows more protection for the insured than those provided in the statute, thereby waiving one or more of the statutory grounds.  *Oliver,* 854 F.2d at 419-20 (citing *United Sec. Life Ins. Co. v. Harden*, 153 So. 2d 246, 247 (Ala. 1963)).

The insureds argue that, under the Alabama rescission statute, a written application must actually correspond to the specific policy that is sought to be rescinded. *See* D&O's Brief in Support, p. 6-7 (doc. # 151).  However, the statutory language does not support such a narrow reading of the law on rescission.  The statute itself refers to statements in the application "<u>or in negotiations therefor,</u>" indicating that statements other than those contained in the application itself can be the basis for rescission. *See* Ala. Code § 27-14-7(a).  The policy language itself, however, may affect the right to rescind.

The insureds rely on two cases for their argument that an application *per se* is required for each policy sought to be rescinded: *Alfa Mutual General Insurance Co. v. Oglesby,* 711 So. 2d 938 (Ala. 1997), and *State Farm General Insurance Co. v. Oliver*, 658 F. Supp. 1546 (N.D. Ala. 1987) (Judge Acker) (applying Alabama law).   To determine what effect, if any, the *Oliver* and *Oglesby* decisions have on the right of the insurance carriers to rescind under § 27-14-7, the court has closely examined those cases.

In *Oliver*, the insurance company sought to avoid payment of a fire loss based, among other defenses, on an alleged misstatement or concealment by the insured in the application. State Farm dropped its <u>contractual</u> right to rescind for intentional misrepresentation and contended that it was entitled to rescind under § 27-14-7(a)(2) and (3).  658 F. Supp. at 1548. After a jury verdict in favor of the insured, State Farm argued in its post-judgment motion that it

26

was entitled to a directed verdict under § 27-14-7(a)(2) and (3).

The policy language at issue provided that the policy would be void if any insured "<u>intentionally</u> concealed or misrepresented any <u>material</u> fact or circumstance relating to this insurance. . ." 658 F. Supp. at 1550 (emphasis provided by Judge Acker).  State Farm elected not to invoke this contractual language but instead sought rescission under § 27-14-7(a)(2) and (3). Judge Acker first addressed rescission under § 27-14-7(a)(3).  That subparagraph prevents recovery under a policy if

> (3)  The insurer *in good faith would* either *not have issued the policy or contract,* or would not have issued a policy or contract at the premium rate as applied for, or would not have issued a policy or contract in as large an amount or would not have provided coverage with respect to the hazard resulting in the loss *if the true facts had been known to the insurer as required either by the application for the policy or contract or otherwise.*
> Ala. Code § 27-14-7(a)(2) and (3) (emphasis supplied).

*Id.* at 1549.

Judge Acker concluded that he should not have submitted any issue to the jury under § 27-14-7(a)(3) for three reasons.  First, the court concluded that "neither the application nor the policy by its express terms *required* exact and full truth if a misstatement, no matter how innocent, might affect the risk." *Id.* at 1550 (emphasis in original).  Judge Acker noted that "[n]owhere in the insurance application can be found any words which track the words in § 27-14-7(a)(3) permitting the insurance company to *contractually require the applicant to tell the truth upon penalty of a voidance of the contract.*  The policy itself, when it was subsequently issued, also fails to contain any of the express language contemplated by § 27-14-7(a)(3) if the insured is to be placed on notice of the potential disasterous effect of any initiating misstatement or omission." *Id.* at 1549-50 (emphasis in original).

27

Another reason the question of rescission under § 27-14-7(a)(3) should not have been submitted to the jury, Judge Acker reasoned, was that the subparagraph did not apply to the renewal policy at issue. An essential element under § 27-14-7(a)(3) requires that "the insurer would not have issued 'the policy or contract' but for the misinformation." *Id.* at 1550. The policy issued in reliance upon the application was the initial policy, not the renewal policy, which was in force at the time of the loss and for which no application had been required. Based on a strict construction of § 27-14-7, Judge Acker concluded that "§ 27-14-7(a)(3) makes no reference to any 'policy or contract' except a 'policy or contract' issued in direct and immediate response to the false application." *Id.* at 1550.

In reaching the conclusion that the only policy for which coverage could be denied under § 27-14-7(a)(3) is the one for which the application contains misstatements, Judge Acker acknowledged that no Alabama cases had construed that subparagraph in such a context. *Id.* Thus, his conclusion was based purely on statutory construction of § 27-14-7(a)(3).

The third reason why Judge Acker concluded State Farm never had a valid defense under § 27-14-7(a)(3) was that the policy language, in essence, "waived the statutory avenue of avoidance provided by § 27-14-7(a)(3) by contracting for something different . . . . State Farm *contractually excused* innocent misrepresentations in the application." 658 F. Supp. at 1550 (emphasis in original; citation omitted).

The court then addressed State Farm's defense under § 27-14-7(a)(2). That subparagraph allows an insurer to avoid coverage if the misrepresentation, etc., was "[m]aterial either to the acceptance of the risk or to the hazard assumed by the insurer; . . ." Judge Acker concluded that the question of whether the alleged misstatement was material was a question for the jury, and

28

that the jury could consider the factual context to make such a determination.  658 F. Supp. at

1552.  Judge Acker noted that State Farm's expert witness did not testify that any particular

misinformation increased the hazard or risk insured.  Instead, the witness acknowledged that "the

'materiality' of a misstatement in an original application depreciates over time so that an

erroneous answer which might have been 'material' to the underwriting at the time of the

issuance of the policy might not be 'material' twenty years later."  *Id.* at 1553.  The question of

materiality was answered by the jury adversely to State Farm.

     In evaluating State Farm's position under § 27-14-7(a)(2), Judge Acker did not address

whether that subparagraph only applied to a policy for which an application had been taken, as he

had found regarding the third subparagraph based on its literal language.  Thus, a careful reading

of Judge Acker's opinion reflects that he concluded that an application is required to deny

coverage under the alternative of § 27-14-7(a)(3) only and that under that supbaragraph the

application or policy must place the insured on notice that an innocent misstatement could void

coverage.  Indeed, the language in subparagraph (a)(3) on which Judge Acker relied is

conspicuously absent from subparagraphs (a)(1) and (a)(2).  Instead, a literal reading of the

statute, including the prefatory paragraph, would indicate an insurer could deny coverage for

fraudulent or material misrepresentations contained "in any application for an insurance policy . .

. or negotiations therefor . . . ."  *See* § 27-14-7(a) (emphasis added).

     On appeal, the Eleventh Circuit decided the question of the carrier's defenses under § 27-

14-7 based on a threshold issue: whether State Farm waived the defenses under § 27-14-7(a)(2)

and (3) by referring in the contract only to intentional misrepresentations or concealments as

grounds for avoidance of the policy.  *State Farm Fire & Cas. Co. v. Oliver*, 854 F.2d at 419-420.

The Court specifically noted that "Alabama courts have read the forerunner statute to § 27-14-7 into the policy when the contract attempted to impose more stringent conditions on the insured than in the statute, but have refused to read the statute into the contract when the contract sets less stringent standards on the insured. . . ." *Id.* at 420 (citing *United Sec. Life Ins. Co. v. Harden*, 153 So. 2d 246, 247 (Ala. 1963); *United Sec. Life Ins. Co. v. Wisener*, 113 So. 2d 530, 531 (Ala. App. 1959)). Therefore, the Court concluded that State Farm, by providing an intentional misrepresentation standard in its policy, had waived the defenses of innocent misrepresentations otherwise available under § 27-14-7(a)(2) and (3). *Id.*

The Eleventh Circuit did not reach Judge Acker's alternative reasons for concluding that the innocent misrepresentation defenses should not have gone to the jury. Specifically, the Eleventh Circuit did not address Judge Acker's conclusion that § 27-14-7(a)(3) requires an application for the specific policy of which rescission is sought.

The Alabama Supreme Court followed Judge Acker's *Oliver* decision in *Alfa Mutual Ins. Co. v. Oglesby*, 711 So. 2d 938, 941 (Ala. 1998). *Oglesby* involved an effort by the insurance company to rescind coverage because of a false answer on the initial application of a homeowner's policy concerning the insured's prior arrests; the policy in effect at the time of the fire loss was a renewal policy for which no separate application had been required. Alfa asserted that the false information "was material to its acceptance of the risk and that if it had known of [the insured's] arrests it would not have issued the policy of insurance." *Id.* at 940. The trial court, relying on *Oliver*, directed a verdict for the insured on Alfa's misrepresentation claims under § 27-14-7, and the jury returned a verdict for the insured on the counterclaim for breach of contract. *Id.*

30

On appeal, Alfa challenged the directed verdict, claiming the trial court erred in finding the *Oliver* case dispositive.  The Court quoted a portion of Judge Acker's discussion of § 27-14-7(a)(3)'s requirement that the "policy or contract" be the one "'. . . issued in direct and immediate response to the false application.'"  711 So. 2d at 941, quoting *Oliver*, 658 F. Supp. at 1550.  The Court then "conclude[d] that the legislature intended that § 27-14-7 apply to initial policies and the applications therefor."  *Id.*  The Court gave no reasons for going beyond Judge Acker's determination that subparagraph (a)(3) required an application for that particular policy.

The Alabama Supreme Court in *Oglesby* did not address the specific language in 27-14-7(a)(3) upon which Judge Acker relied when he determined that subparagraph (a)(3) requires an application for the policy to be rescinded.  The Court did not even set out under which subparagraph of § 27-14-7 Alfa sought rescission, but apparently Alfa relied on subparagraph (a)(3) when it contended that the misinformation was material and it would not have issued the policy had it known the truth.  *See* 711 So. 2d at 940.  The Court did not hedge in any way when it stated that § 27-14-7 – without reference to any subparagraph – applies to initial policies and applications.  However, the Court did not have squarely before it whether subparagraphs (a)(1) intentional fraud or (a)(2) material misinformation are similarly limited.  In other words, the only issue squarely presented to the Court was whether subparagraph (a)(3) required an application for the specific policy in question.  Because the requirements of § 27-14-7 <u>as a whole</u> was not before the Court and was not necessary to the decision in that case, the Court's pronouncement is *dictum* and not controlling.  *See Mitchell v. Vann*, 174 So. 2d 501, 507 (Ala. 1965); *Knight v. State*, 142 So. 2d 899, 905 (Ala. 1962) (describing *dictum* as "express[ing] an opinion based on facts not shown by the record); *Kimball v. Cunningham Hardware Co.* 68 So. 309, 311 (Ala. 1915)

31

(same).

Because the precise issue before the Alabama Court involved § 27-14-7(a)(3), not the section as a whole, making the court's pronouncement as to § 27-14-7 *dictum*; and because the Court only quoted from Judge Acker's discussion of subparagraph (a)(3) as it related to an application for the policy, the court doubts whether the Alabama Supreme Court, if confronted with the precise issue, would follow *Oglesby's* broad pronouncement. A closer examination of the initial language of § 27-14-7(a) increases the court's doubt.

The section begins by providing that statements in "any application for an insurance policy . . . or in negotiations therefor" are representations and not warranties. The second sentence, which leads into the three alternative statutory grounds for denial of recovery, provides that misinformation "shall not prevent a recovery under the policy or contract . . . ." (Ala. Code § 27-14-7(a). Applying the same statutory construction employed by Judge Acker and approved by the Alabama Supreme Court, "the policy or contract" in the prefatory paragraph refers to the one issued in response to the application, or in response to "negotiations therefor." Thus, a solid argument could be made based on statutory construction that an insurer can deny recovery under "the policy or contract" because of fraudulent or material misrepresentations contained in an application for that policy or "in negotiations therefor," regardless of whether the policy is the initial policy or a renewal policy.

Limiting an insurance company's right to rescind a policy for fraudulent or material misrepresentations made in an application or negotiations for a renewal policy would eviscerate the concept of mutuality that underlies a party's right to rescind a contract that was procured by fraud. The insured would have no incentive to tell the truth after the expiration of the initial

policy period, and insurance companies would be less likely to continue renewing policies when they cannot rely on insureds to be truthful or face the consequences of their misrepresentation. Without the right to rescind renewal policies obtained by fraud or material misrepresentations, insureds would face no consequences. Instead, they would be rewarded for their lies. Section § 27-14-7 nowhere even hints that it was designed to protect insurance companies from misrepresentations in the application <u>only</u> during the length of the initial policy without regard to whether subsequent misstatements were made in obtaining a renewal policy. *See Oglesby*, 711 So. 2d at 945-946 (Hooper, C.J., dissenting). This court seriously doubts that the Alabama Supreme Court would allow this *dictum* from the *Oglesby* decision to have such far-reaching consequences.[27]

If the Alabama Supreme Court were squarely presented with the issue, this court anticipates that the Alabama Supreme Court would modify the language in *Oglesby* to apply only to § 27-14-7(a)(3), and would recognize that under subparagraphs (a)(1) and (2) misrepresentations justifying avoidance of coverage could occur in "negotiations therefor" as well as in an application. This court further believes the Alabama Supreme Court would recognize that misrepresentations in a subsequent application or "negotiations therefor" could support rescission of renewal policies as well – provided that an application or negotiations in

---

[27] Counsel for the directors and officers argued that under Alabama law, when the legislature readopts a code section or incorporates it into a subsequent enactment of the Code, the legislature presumably adopts the judicial construction placed on that statute if the legislature does not change the language of the section. *Hall v. Chi*, 782 So. 2d 218, 221-222 (Ala. 2000); *Jones v. Conradi*, 673 So. 2d 389, 392 (Ala. 1995) (noting the history of this principle). Granted, the Alabama Legislature has readopted the Code of Alabama as compiled without changing the language of § 27-14-7 as interpreted by the Alabama Supreme Court in *Oglesby*. *See* Acts of Ala. No. 1999-203 and No. 2002-403. Although this general principle of law is correct, it does not apply here where the interpretation of the statute in *Oglesby* constitutes *dictum* and is not controlling.

fact occurred for the renewal policy.  Nothing in the language of § 27-14-7 limits its application to <u>only</u> the initial policy if the policy in question were issued in direct response to an application or negotiations for it.

Alabama Code § 27-14-7 reflects a modification of prior insurance law that allowed an insurer to void a policy based on an immaterial or technical breach of a warranty[28] in the policy. The first sentence of § 27-14-7 provides that "[a]ll statements and descriptions in any application for an insurance policy . . . , or in negotiations therefor, by, or in behalf of, the insured . . . shall be deemed to be representations <u>and not warranties</u>."  (Emphasis added.)  This change in insurance law reflects an effort by the legislature to even the playing field for insureds.  Further, the second sentence of § 27-14-7 provides that "[m]isrepresentations, omissions, concealment of facts and incorrect statements <u>shall not prevent a recovery under a policy or contract unless</u>. . . ." (Emphasis added.)  As Judge Acker noted in *Oliver*, this language mandates a strict interpretation of the statute in favor of the insured.   *See* 658 F. Supp. at 1550.

This remedial statute and the Alabama cases interpreting it, read together, reflect the public policy of Alabama that § 27-14-7 should be construed narrowly, and that policy provisions concerning denial of coverage should be construed in favor of the insured – particularly one who did not participate in the fraud – whenever possible.

---

[28] A warranty refers to a statement or promise by the insured that is contained in or incorporated into the policy.  Historically, if not literally true or totally fulfilled, the insurance company could deny coverage for breach of warranty, regardless of whether the warranty was material or the breach of it increased the rest, or was even related to the loss.  In other words, the validity of the insurance contract depended upon the total fulfillment of the warranty.  *See,* Robert H. Jerry, II, *Understanding Insurance Law* § 101 (Matthew Bender 2d ed. 1996); Robert E. Keeton, Alan I. Widiss, *Insurance Law* § 5.7 (West Pub. 1988).  In response to the harshness of the warranty rule, many state legislatures, including Alabama's, took taken action to ameliorate those strict effects.  *See* Jerry, *supra*, at § 101[e][3], p. 673, (discussing the effect of statutes such as Alabama Code § 27-14-7).

Following the reasoning in *Oliver* as adopted by the Alabama Supreme Court in *Oglesby*, this court concludes that an insurance company cannot rescind a policy under § 27-14-7(a)(3) unless the policy was issued "in direct and immediate response to the false application." *Oliver*, 658 F. Supp. at 1550. Also, the application or policy must place the insured on notice of the disastrous result of an innocent misstatement to invoke § 27-14-7(a)(3). 658 F. Supp. at 1549-50; § 27-14-7(a)(3). The court need not decide at this stage whether a specific application must be provided for an insurer to rescind under § 27-14-7(a)(1) or (2), or whether misstatements "in negotiations therefor" would suffice because, as discussed subsequently, the relevant policy language at issue here provides greater protection to the insureds than § 27-14-7 and controls the determination of the question before the court.

## C.  Alabama Cases Involving Severability of Interest Provisions

Neither the insurance companies nor the insureds have cited the court to any Alabama cases that have addressed the specific issue of the rescission of an insurance policy that contains a severability clause similar to those at issue here, and the court could find none. The most relevant Alabama case involved the application of a severability of interest provision to an exclusion from coverage.

In *United States Fire Ins. Co. v. McCormick*, 243 So. 2d 367 (Ala. 1970), the Alabama Supreme Court addressed several issues of policy interpretation that arose in the context of the complicated Alabama law regarding co-employee liability. The pertinent issue to this case from *McCormick* was one of first impression for the Court: the effect of the severability of interest clause in the policy on the exclusion of coverage for "'bodily injury to or sickness, disease or death of any employee of the insured arising out of and in the course of his employment by the

35

insured.'" *Id.* at 370. The "Severability of Interest" clause provided that the "'term 'the insured'

is used severably and not collectively . . .'" *Id.* at 373. After discussing cases from other courts,

the court concluded that the severability clause mandated that each insured be considered

"separately, independently of every other insured whether named or an additional insured." *Id.* at

375. Therefore, in the context of the *U. S. Fire* policy, each insured was covered <u>except</u> as to his

own employee. *Id.*

A closely analogous case is *Norwest Mortgage, Inc. v. Nationwide Mutual Fire Ins. Co.*,

718 So. 2d 15 (Ala. 1998). That case involved a homeowner's insurance policy that had been

procured by fraud on the part of the homeowner. Norwest Mortgage held the mortgage, and was

covered under the policy, but had no knowledge of the named insured's fraud. 718 So. 2d at 16.

Nationwide sought to rescind the policy under Alabama Code § 27-14-7. The trial court granted

summary judgment for Nationwide, finding the policy void *ab initio*. The mortgagee appealed

and the Alabama Supreme Court reversed. 718 So. 2d at 16

The key factor in the Court's decision in *Norwest* was the existence of a Mortgage Clause

in the policy. That clause provided that "'[i]f we deny your [the homeowner/insured's] claim,

that denial will not apply to a valid claim of the mortgagee. . .'" 718 So. 2d at 16. The policy

language did not contain the traditional language found in the "standard" mortgage clause to the

effect that no act or neglect of the mortgagor would invalidate the mortgagee's interest.[29]

Nevertheless, the Court held that the mortgage clause created a separate contract of insurance

---

[29] *See, e.g.,* Robert H. Jerry II, *Understanding Insurance Law* § 53A[a] (Matthew Bender 2d ed. 1996); Robert E. Keeton, Alan I. Widiss, *Insurance Law* § 4.2(b) (West Pub. 1988).

with Norwest "that was not subject to the nullifying effects of § 27-14-7." 718 So. 2d at 17.[30]

In *Norwest*, only the mortgage holder appealed, so the Court did not address the trial court's conclusion that the policy was void *ab initio* as to the homeowner.

### D. Cases from Other Jurisdictions Involving Severability Clauses

Very few decisions exist concerning the effect of severability clauses on the right of a carrier to rescind a policy as to all insureds. Perhaps this lack of case law is because, as counsel for some of the carriers stated, the presence of severability clauses as to coverage is a relatively new phenomenon in insurance policies. The few decisions that have been cited to the court, though not binding authority, add insight to the primary issue before the court at this time. The most enlightening cases are those that involved Federal Insurance Company, the primary D&O carrier here.

In *Wedtech Corp. v. Federal Insurance Co.*, 740 F. Supp. 214 (S.D.N.Y. 1990), the court had to interpret a severability clause similar to the one at issue here[31] in determining whether the

---

[30] On a somewhat related, but not totally analogous point, Alabama courts have recognized that an insurance company cannot deny coverage to an insured solely because of conduct that negates coverage as to another insured. For example, in *Hosey v. Seibels Bruce Group*, 363 So. 2d 751, 753-54 (Ala. 1978), the Court held that arson by the insured wife would not defeat the claim of the innocent husband insured. The Court found that the interests of each insured were severable, even without policy language so providing.

[31] That policy provided:

> In granting coverage under this policy to any one of the Insureds, <u>the Company has relied upon the declarations and statements in the written application for coverage</u>. All such declarations and statements are the basis of such coverage and shall be considered as incorporated in and constituting part of the policy.
> The written application for coverage shall be construed as a separate application for coverage by each of the Insured Persons. With respect to the declarations and statements contained in such written application for coverage, <u>no statement in the application or knowledge possessed by any Insured Person(s) shall be imputed to any other Insured Person(s) for the purpose of determining</u>

37

policy was void *ab initio* as to certain directors.  As in this case, the insured company, Wedtech, was the subject of government investigations, and several former directors and officers had been convicted of various crimes.  *Id*. at 216.  Federal rescinded the policies, which included the original policy and a renewal policy, based on false information provided "in connection with applying for and maintaining" the policies.  *Id*. at 217.  Wedtech filed suit, seeking a declaration that "'the Policies are not void *ab initio* and are in full force and effect with respect to those directors and officers who acted in good faith in the performance of their duties for Wedtech.'"  *Id*.

The court acknowledged the basic principles of New York law that fraud in the inducement can render an insurance policy void *ab initio*.  740 F. Supp. at 218.  "Thus, a D&O policy can be found void *ab initio* and rescission deemed appropriate if the policy was obtained through a material misrepresentation, even when there are officers and directors who had no knowledge of the fraud. . . .  <u>Where the insurance policy contains a severability provision, however, some of the officers and directors might still be entitled to coverage</u>."  740 F. Supp. at 218 (citation omitted; emphasis added.)  Thus, the *Wedtech* court faced the same issue presently before this court.

The court in *Wedtech* discussed *Shapiro v. American Home Assurance Co.,* 616 F. Supp. 900 (D. Mass. 1984), in which the court found that a less-precise severability provision and the policy as a whole conveyed a "manifest intent" to provide coverage for each insured who did not participate in the misrepresentation.  740 F. Supp. at 218.  The *Wedtech* court then found:

---

> the availability of coverage with respect to claims made against any Insured
> Person(s) whether or not the Insured Organization grants indemnification.

740 F. Supp. at 216 (emphasis added).

38

> The intent of the parties to the insurance policy in this case
> to bar coverage only for those insureds who participated in the
> fraudulent inducement is even more apparent than in *Shapiro*.
> Immediately after a discussion of the "declaration and statements"
> relied upon by Federal in the application for coverage, the policies
> indicate that no statement in the application or knowledge on the
> part of one insured is to be imputed to another insured in
> determining the availability of coverage.  The provision further
> indicates that the written application for coverage is to be
> construed as a separate application by each insured.

*Id.* at 219.

The court in *Wedtech*, like this court, was not asked to determine whether any specific

officer or director had coverage, "but only whether the policies were void *ab initio* with respect

to each and every director regardless of whether he participated in the alleged fraudulent

inducement."  *See Id.*  The majority of the court's opinion addressed Federal's argument that

Wedtech's claim did not present a justiciable controversy, similar to Travelers' position in this

case.  *See* 740 F. Supp. at 219-221.  The court rejected those procedural arguments,[32] and granted

summary judgment for the insureds.

Another case involving interpretation of the Federal policy is *Federal Insurance Co. v.

Oak Industries,* Civil No. 85-985-G(M) (S.D. Cal. 1986).[33]  In that case, Federal sought a

declaratory judgment that the D&O policy issued to Oak Industries was void *ab initio* because

---

[32] In addressing part of Federal's justiciable controversy argument, the court noted that Federal's obligation under the policy to reimburse the directors for defense costs attaches as soon as the attorneys' fees are incurred and continues "unless or until Federal can exclude the possibility of any recovery for which it provided insurance."  *Id.* at 221.

[33] The court issued a series of opinions on motions for partial summary judgment and/or motions to dismiss filed by Oak Industries and various officers and directors.  *See* 1986 U.S. Dist. LEXIS 29699 (Feb. 3, 1986) as to Oak Industries' Motion for Partial Summary Judgment; 1986 U.S. Dist. LEXIS 29604 (Feb. 5, 1986) as to Frank A. Astrologes' Motion to Dismiss; 1986 U.S. Dist. LEXIS 29605 (Feb. 5, 1986) as to Gary T. Barbera's Motion to Dismiss; 1986 U.S. Dist. LEXIS 29606 (Feb. 5, 1986) as to Philip S. Harper's Motion to Dismiss; 1986 U.S. Dist. LEXIS 29608 (Feb. 5, 2986) as to Carl J. Bradshaw's Motion to Dismiss; 1986 U.S. Dist. LEXIS 29614 (Feb. 5, 1986) as to John P. Givin's Motion to Dismiss.

"procured by material misrepresentations or omissions contained in public filings and statements

made by Oak." 1986 U.S. Dist. LEXIS 29699 at *3. As to Oak's Motion for Partial Summary

Judgment, the court found that by the terms of the policy, "the only declarations and statements

of Oak, its directors and officers inquired into and relied upon by Federal in issuing the Policy

were those contained in Oak's policy application. . . . Therefore, the misstatements and

omissions contained in Oak's public filings and statements in existence at the time of the

issuance of the Policy are not grounds for rescission of the Policy." *Id* at *5-6 (emphasis added).

The court, however, did not set out the precise terms of the policy on which it based its decision.

It granted the Motion for Partial Summary Judgment in favor of the corporate insured and held

that the policy was valid and enforceable according to its terms. *Id.* at *10-11.

   The court addressed the motions to dismiss on behalf of various directors in separate

opinions, but the language in all is virtually identical. The decision regarding one insured,

Astrologes, is illustrative. 1986 U.S. Dist. LEXIS 29604. The court addressed policy language

that appears to be similar to the severability clause at issue here, although the court did not quote

the provision in its entirety. The court outlined the policy provisions:

> the single application for coverage submitted by Oak "shall be
> construed as a separate application for coverage by each of the
> Insured Person(s)". (Policy, paragraph 2.11) Furthermore, the
> Policy provides, "with respect to the declarations and statements
> contained in such written application for coverage, no statement in
> the application or knowledge possessed by any Insured Person(s)
> shall be imputed to any other Insured Person(s) for the purpose of
> determining the availability of coverage with respect to claims
> made against any insured person(s) whether or not the Insured
> Organization grants indemnification". (Policy, paragraph 2.11)

*Id*. at *8-9 (emphasis added). The court found that this language specifically "provides separate

coverage for the individual insureds and unambiguously provides no statement or knowledge of any insured will be imputed to the other insureds covered by the Policy." *Id*. at *9. The court found that in light of the policy language, to state a claim of rescission as to all insureds, Federal must establish (1) its right to rely on representations outside the policy application and that "(2) each of the insureds possessed knowledge of the declarations contained in the application for coverage." *Id*. As the court discussed in granting Oak's motion for summary judgment, based on language in the policy, Federal could not rely on statements outside of the application in seeking rescission. *Id*. at *10.

In evaluating the sufficiency of the allegations in the complaint against the individual insureds, the court noted that the complaint merely alleged that the individual insured signed the financial statements. The court found the complaint inadequate because it merely imputed misrepresentations and omissions to all insureds without the requisite particularity as to the knowledge of individual insureds. The court, therefore, granted the motion to dismiss. *Id*. at *11-12.[34]

Although not addressing the precise language in the Federal policy at issue here, the leading case concerning the effect of a severability clause on an insurer's right to treat a policy as void *ab initio* is *Shapiro v. American Home Assurance Co.*, 616 F. Supp. 900 (D. Mass. 1984).

---

[34] Another case involving interpretation of the Federal D&O policy is *Bogatin v. Federal Insurance Co.*, 2000 WL 80443 (E.D. Pa.). In that case, however, the severability clause of the Federal policy was not at issue because the sole insured seeking coverage was the former President, CEO, and board member who actually signed the application. The evidence presented in a three-day bench trial established that he personally made material misrepresentations in the applications and that he had knowledge of their falsity. *See Id.* at *1, *5, *7, *11. In fact, the court did not even mention the severability clause and, therefore, the *Bogatin* case provides no guidance on the issue before this court.

That case involved a severability clause in a securities liability policy.[35]  The severability

provision at issue stated: "'. . . this Insurance shall be construed as a separate contract with each

Insured . . . and the liability of the Insurer to such Insured shall be independent of its liability to

any other Insured.'" *Id.* at 902.  The insurers[36] argued that the policies were void *ab initio*

because they were procured based on false financial statements.  Judge Keeton found that the

"clear severability provision" required that he disregard all other insureds and focus only on the

two insureds who were before him.  He then determined that those insureds "cannot be barred

from coverage under the policy solely on the basis of the fraudulent acts of other insureds. . . ."

*Id.* at 903.

        The insurers also asserted that an exclusion to coverage for actual or willful fraud by any

insured precluded coverage for all insureds.  Judge Keeton noted that the severability clause

contained in an addendum to the policy reflected the "manifested intent" of the parties and

modified that exclusion.  616 F. Supp. at 904.  The court then concluded that, based on the entire

policy and the severability provision, "the manifest intent of the insurers and insureds in this case

was to provide coverage for underwriters, directors, officers, and other insureds separately as to

each insured, unless that insured participated in an intentional fraud."  *Id.* at 905.

        Judge Keeton did not have before him, and therefore did not decide, whether the policy

could be treated as void *ab initio* as to other insureds who were not parties in the case.  He

---

[35] Judge Keeton had previously held that the D&O policy was void *ab initio* as to all insureds because of misrepresentations made by the company's former president in obtaining coverage.  That D&O policy, however, did not have a severability clause.  584 F. Supp. 1245, 1252-53 (D. Mass. 1984).

[36] The insurers were Pacific Indemnity Company and two excess carriers.  The excess carriers did not dispute that the severability clause in the primary policy governed their rights as well, although the excess policies apparently contained no separate severability clause.  *See* 616 F. Supp. at 902, 903.

merely ruled that the severability clause precluded denying the plaintiffs' claims for coverage because of fraudulent activities of other named insureds. *See* 616 F. Supp. at 906.

Another case involving the effect of a severability clause, and the only Circuit Court decision found, is *Atlantic Permanent Federal Savings & Loan Assoc. v. American Casualty Co. of Reading, Pa.*, 839 F.2d 212 (4th Cir. 1988). That case involved claims for coverage under a D&O policy with a severability clause. That clause provided: "'this policy shall not be voided or rescinded and coverage shall not be excluded as a result of any untrue statement in the [application] form, except as to those persons making such statement or having knowledge of its untruth.'" *Id*. at 215. One of the defenses the carrier asserted against coverage was that the policy was void because obtained by a material misrepresentation. The carrier argued, as do some of the insurers here, that the severability clause never took effect because the misrepresentations in the renewal application rendered the policy void from its inception. *See Id.* The court rejected that argument, finding instead that the severability clause reflected the parties' manifest intent to prevent misrepresentations made by insureds in applying for coverage from depriving other non-participating insureds from coverage. *Id.*

This court has repeatedly asked counsel for any case that has allowed an insurer to void a policy *ab initio* as to all insureds in the face of a severability clause. After the hearing, liaison counsel for the insurance companies presented the court with a recent decision that did hold that a severability clause did not prevent an insurance company from rescinding coverage for all insureds, *Cutter & Buck, Inc. v. Genesis Ins. Co.*, No. C02-2569P (W.D. Wash. Feb. 11, 2004). The language of that severability clause, however, differed drastically from the language in the policies before this court. That severability clause specifically provided that misrepresentations

43

made with actual intent to deceive or that were material would void that policy in its entirety, and that material information known to the person who signed the application could be imputed to other insureds.[37] Thus, because the policy language is easily distinguishable, the *Cutter & Buck* decision does not support the insurance companies' position here.

### E. D&O Coverage under the "Federal Stack"

In addressing the various arguments asserted by the insurance companies concerning the effect of the representations and severability provisions, the court is assuming that the Alabama Supreme Court would modify *Oglesby* as discussed earlier in this opinion. Otherwise, § 27-14-7 would provide no right to rescind any of the policies at issue at this time because they are all renewal policies. *See Oglesby*, 711 So. 2d at 941.

The court agrees with the insurers that, if squarely presented to the Alabama Supreme Court, a solid argument could be made that neither *Oglesby*, 711 So. 2d 938, nor *Oliver*, 658 F. Supp. 1546, limit an insurance company's right to rescind to an initial policy *if* subsequent underwriting is done, and that Alabama Code § 27-14-7 allows rescission for material or

---

[37] The policy provision read:

> [I]n the event that the Application, including materials submitted therewith, contains <u>misrepresentations made with the actual intent to deceive, or contains misrepresentations which materially affect either the acceptance of the risk or the hazard assumed</u> by the INSURER under this Policy, this Policy <u>in its entirety shall be void</u> and of no effect whatsoever; and provided, however, that no knowledge possessed by any DIRECTOR or OFFICER shall be imputed to any other DIRECTOR or OFFICER <u>except for material information known to the person or persons who signed the Application</u>. In the event that any of the particulars or statements in the Application is untrue, this Policy will be voided with respect to any DIRECTOR or OFFICER who knew of such untruth.

*Cutter & Buck*, Order of Feb. 11, 2004 at 33, (emphasis added).

fraudulent misrepresentations made as part of the negotiations for that policy.  That argument, however, would be of no avail in this case because of controlling policy language.

Although the Federal claim for rescission is not before this court and instead is pending in the state court, to determine the rights and responsibilities of the excess carriers who follow the Federal coverage, this court of necessity must examine and determine the effect of the severability clause in the Federal policy.  The court has consulted with Judge Horn who is presiding over the state court proceeding to avoid an inconsistent result, and he concurs in this decision.

The Federal policy clearly limits the rescission rights of Federal and the excess carriers on the D&O coverage.  The "Representations and Severability" clause modifies  § 27-14-7 to negate representations other than those made in a "written application" as a basis for rescission as to individual insureds.   As previously stated, Alabama law allows insurers to narrow, but not broaden, the basis for rescission. *See Oliver*, 854 F. 2d at 420.  The Federal representations clause, thus, narrows the basis for rescission to representations made in the written application. *See, Fed. Ins. Co. v. Oak Indus., Inc.*, 1986 U.S. Dist. LEXIS 296999 at \*2, 6.

The Federal policy language also waives innocent misrepresentations as a basis for rescission.  The severability clause, contained in the same provision as the representations clause, unambiguously provides that the rights of each insured as to coverage will be separately determined.  No representations or <u>knowledge</u> of any insured person shall be imputed to any other insured person.  The Federal severability clause by referencing knowledge of an insured person in the only provision relating to representations effectively negates innocent misrepresentations as a basis for rescission. *See Oliver*, 854 F.2d at 420.  Only statements made

45

with personal knowledge of their falsity can be used by the carrier for the purpose of denying coverage.   Thus, the severability clause read together with the representations clause provides that Federal can only rescind as to an insured person who personally made a knowing misrepresentation in the written application on which Federal relied to issue the policy.

Federal concedes that no written applications were received for the renewal policies it issued after 1994, but argues that it can rescind based on representations contained in the HealthSouth financial statements.  Federal argues that paragraph 17, the Representations and Severability clause, does not preclude it from rescinding the policy based on misrepresentations made to Federal outside and apart from the written application without being bound by the severability provision.  In other words, Federal argues that paragraph 17 only precludes it from imputing to an insured statements and knowledge about information provided in the written application by another insured, but has no effect on its right to rescind coverage based on misrepresentations contained in something other than the "written application" referenced in that paragraph.

Not only would this argument produce a contorted reading of clear and plain policy language, it is the precise argument Federal made and lost in *Oak Industries*.  *See* 1986 U.S. Dist. LEXIS 29699 at *3, 5-6.  Federal cannot negate the effect of paragraph 17 by claiming reliance upon some other information not mentioned in the policy and seeking to use any alleged misrepresentations outside of the written application to rescind the policy.  An insurance company must live with the insurance policy it wrote and the court will not construe the policy to defy a common sense reading of the precise language chosen by the insurer that would bring about an absurd result. *See, Boone*, 690 So. 2d at 406.

Having determined the legal effect of the Federal severability clause, the court must evaluate the effect of that determination on the excess D&O carriers. That effect depends on whether the excess policies provide that they do not follow the Federal policy regarding the severability clause.

Some excess carriers[38] argue that the absence of a severability clause in their policies means that those policies differ from and are not bound by the Federal severability clause. They point out that the Federal severability clause is contained in the same section with the representations clause. They then cite the representations clauses in their policies that do not contain a severability provision. Thus, they argue, their policies do not "follow form" of the Federal policy because they omit the severability clause.

The mere absence of a severability clause in the excess carriers' policies does not change the coverage provided. The excess policies are "follow form" policies, meaning that except where they specifically provide otherwise, the terms of their policies follow those of the primary and preceding carriers. The mere absence of a severability clause does not qualify as "except as provided otherwise." Not all of the terms, conditions, and limitations of the Federal policy appear in any of the excess policies. Indeed, one would not expect to find all the terms and conditions of the primary policy in the excess policy. Only where the excess policy specifically designates a different term do the policies differ.

The terms of the Federal primary policy and the excess policies do not conflict. By necessity and definition, a "follow form" policy does not copy or re-print all the language and provisions of the underlying policies, but instead incorporates those terms as if they were stated

---

[38] Specifically, Gulf Insurance Company (doc. # 222) and Zurich American Insurance Company (doc. # 220).

in full in the excess policy.  A "following form" clause in a policy of excess coverage incorporates by reference all the terms and conditions of the underlying policy, "except to the extent that the [excess] contract <u>by its own terms</u> specifically defines the scope of coverage differently, *i.e.,* via an exclusion...."  *United Fire & Cas. Co. v. Arkwright Mut. Ins. Co.,* 53 F. Supp. 2d 632, 641 (S.D.N.Y. 1999) (citations omitted; emphasis added.).  As a general rule, "excess policies are typically following-form instruments that incorporate by reference the terms of the underlying policies unless there is a <u>specific term to the contrary</u> in the excess policy." *Scottsdale Ins. Co. v. Safeco Ins. Co. of Am.*, 111 F. Supp. 2d 1273, 1278 (M.D. Ala. 2000) (citations omitted; emphasis added), *aff'd without opinion*, 254 F.3d 1084 (11th Cir. 2001). Silence does not provide the insured with the notice needed that the excess carrier is not following the form of the severability clause, and, therefore, silence cannot supply a specific term to the contrary.

At the hearing, the court inquired of counsel for the excess carriers if they could cite any authority that holds that silence or mere absence of a provision constitutes a change in policy terms in an excess policy.  They could not.  Without any such authority, this court is unwilling to write into the excess policies a provision negating the severability clause of the underlying coverage.  Insureds are entitled to rely on the language contained in insurance contracts, and do not have to guess about the absence of language in "follow form" excess policies.

The court, thus, concludes that the excess policies "follow form" with the Federal policies, thereby making the Federal severability clause a part of all the excess policies in the Federal D&O stack.  The fact that the excess carriers have different or more defined provisions in their representations clauses broadens the documents on which they can rely, but

48

does not negate the severability clause. The only logical way to read the representations clauses in the excess policies is to include the severability clause of the Federal policy immediately thereafter. Thus, the excess carriers cannot deny coverage for any misrepresentation in any documents listed in their respective representations clauses as to insureds who did not personally make misstatements with knowledge of the falsity in the referenced applications or negotiations for the specific policy sought to be rescinded.

Some of the excess carriers argue that the severability clause in the Federal policy is not as precise as the ones at issue in other cases, and therefore should be read narrowly. Granted, the Federal provision lacks the precision of the clause at issue in *Atlantic Permanent Fed. Savings & Loan*, which specifically mentioned rescission. *See* 837 F.2d at 215. The language in the Federal severability clause, however, provides more clarity than the clause in *Shapiro*, which basically only provided that the policy should be construed as a separate contract for each insured and did not mention statements in applications or that knowledge of any insured would not be imputed to any other insured. Judge Keeton found that meager language "clear" and reflecting the "manifest intent" of the parties. *See* 616 F. Supp. at 903, 905. The severability clause in the Federal policy provides even greater clarity as to the intent of the parties that statements and knowledge of one insured will not defeat coverage as to another insured.

Similar to the argument by Federal discussed earlier, the excess carriers argue that the severability clause of the Federal policy does not apply to representations made outside of an application form. They also argue that because their "representations" clauses are broader, they can rescind based on misrepresentations contained in documents other than a written application

49

without regard to the Federal severability clause.[39]  Zurich, and the carriers who provide coverage

above the Zurich layer[40] assert a variation of the "representations" clause argument.  The Zurich

policies contain more detailed listing of representations upon which its policies were issued.[41]

Indeed, the 2001 Zurich policy specifically enumerated documents on which it relied in issuing

the policy.  Thus, the excess carriers argue they may ignore the severability clause and rescind as

to all insureds based on alleged misrepresentations in the HealthSouth financial statements.

They further argue that because the financial statements were made by HealthSouth, the

"insured organization" and not an "insured person," the Federal severability clause does not

apply to protect insured persons from rescission based on HealthSouth statements.  The carriers

point to the definition section that includes a separate definition for "Insured Organization," who

in this case is HealthSouth and its subsidiaries.  Because the severability clause does not preclude

imputation of statements or knowledge by the "Insured Organization" to an "Insured Person," the

carriers argue that HealthSouth's false financial statements can be imputed to all the "Insured

Persons" to justify rescinding their policies *in toto*.  The logical conclusion of this argument is

---

[39] The St. Paul policy provides:

> In consideration of the payment of the premium, <u>in reliance upon the statements made to the Insurer by application including its attachments,</u> a copy of which is attached to and forms a part of this policy, <u>and any material submitted therewith</u> (which shall be retained on file by the Insurer and to be deemed attached hereto), and except as hereinafter otherwise provided or amended, this policy is subject to the same Insuring Agreement(s), Terms, Conditions and Limitations as provided by the [Federal] policy. . . .

(Emphasis added).

[40] Specifically, Federal Insurance Company, St. Paul Mercury Insurance Company, and Royal Insurance Company.

[41] *See* the relevant provisions quoted *supra*.

that information in the HealthSouth financial statements is imputed to the individual "Insured Persons" regardless of whether they personally made any misstatements or had any knowledge of the alleged misrepresentations by HealthSouth.

This argument totally misreads the severability clause and renders an absurd result.  The Federal severability clause reads: "No *statement* in the application or *knowledge* possessed by any **Insured Person** shall be imputed to any other **Insured Person** for the purpose of determining if coverage is available." (Bold in original; emphasis added.)  The application referred to in this provision logically is the application submitted by HealthSouth.  The severability clause also provides that HealthSouth's written application for coverage "shall be construed as a separate application for coverage by each of the **Insured Persons**."  The severability clause applies both to the statements in the HealthSouth application and to *knowledge* possessed by any insured person.  The severability clause makes knowledge of each individual insured relevant for rescission purposes as to each insured.   Without proof that an individual insured had knowledge of any false statements by HealthSouth, the severability clause precludes rescission as to that insured.

The excess carriers' argument also misses two important points.  First, none of the policies say that the Insured Organization is to be deemed the agent of Insured Persons in applying for coverage, or that knowledge of the Insured Organization is to be imputed to the Insured Persons.  The insurance companies could have so provided.[42]  To construe the policy as

---

[42] The Federal policy clearly specifies circumstances in which the Insured Organization is to act on behalf of the insureds and the "application process" is not among those circumstances.  The "Authorization Clause" reads:

> By acceptance of this policy, the **Parent Organization** agrees to act on behalf of all Insureds with respect to the giving and receiving of notice

the excess carriers propose would essentially undermine "severability" in all circumstances because the "Insured Organization" is the entity that makes all representations and filings.  D&O coverage, under these circumstances, would be entirely illusory.  Moreover, by definition, the person signing the application for the "Insured Organization" is also an "Insured person" – and undisputedly a statement by or knowledge of one "Insured Person" cannot be imputed to another "Insured Person."

Second, if an insurance company meant to say that knowledge of the Insured Organization was to be imputed to Insured Persons, it could have provided so in the policy. Insurance companies clearly know how to address imputation issues.  For example, in Endorsement 8, Federal drafted language relating to entity coverage that specifically stated that knowledge of Insured Persons <u>would be imputed</u> to the Insured Organization as to Insuring Clause 3.  Thus, the absence of such explicit imputation language in the policy is fatal to the excess carriers' proposition that representations by HealthSouth should be imputed to individual insureds without regard to their personal knowledge.

The Federal policies and the excess policies provide  coverage to the officers and directors against liability for "wrongful acts."   The Federal policy defines "wrongful acts" to include any misstatement, misleading statement, or omission.  If the companies can rescind coverage because of misstatements or misleading statements in HealthSouth SEC filings, without showing that the individual insured *knew* of the misstatement, then coverage under the D& O

of claim or termination, the payment of premiums and the receiving of any return premiums that may become due under this policy, the negotiation, agreement to and acceptance of endorsements, and the giving or receiving of any notice provided for in this policy (except the giving of notice to apply for the Extended Reporting Period), and the Insureds agree that the **Parent Organization** shall act on their behalf.

policies would be totally illusory.  Under the interpretation urged by the excess carriers, officers and directors who have no specific control over or intimate knowledge about statements contained in SEC filings and other financial reports would not have insurance protection in cases of misstatements by the corporation or other insureds.  The insurers' argument would apply even if an individual director could not possibly determine the existence of any intentional deception, particularly in financial reports that were certified as correct by an outside accounting firm.

Such an interpretation would violate the manifest intent of the policy, and would ignore the motivation for obtaining officers and directors coverage in the first place – to protect officers and directors from liability for actions of the corporation.  Without such coverage, or under the interpretation urged by the excess carriers, finding qualified persons to serve on a board of directors would be next to impossible.  The argument presented by some excess insurers that they can rescind as to all insureds merely because of false statements in publicly available financial reports must fail because the policy language does not support it and because such an argument would lead to an absurd result.[43]

None of the excess carriers argue that all of the insureds made misrepresentations or had knowledge of misrepresentations.  Some carriers do seek rescission as to directors who signed false SEC filings merely because they signed the documents regardless of whether they had actual knowledge of the falsity.  The court need not decide at this point whether merely signing such document without knowledge of misrepresentations could be grounds for rescission, although the court has serious doubts that such would suffice.  *See, e.g., Shapiro*, 616 F. Supp. at

---

[43] In fact, the Federal policy limits coverage for misstatements in public filings and excludes coverage in Section 6(b) for any "deliberately fraudulent act or omission or any willful violation of any statute or regulation" by an Insured Person, but only "if a judgment or other final adjudication adverse to the Insured Person establishes such a deliberately fraudulent act or omission or willful violation."

905; *Oak Indus.*, 1986 U.S. Dist. 29604, at *11. The Federal policy establishes knowledge as a determining factor.

The court, therefore, concludes that the legal effect of the severability clause in the Federal policies bars the excess carriers from rescinding their policies as to any insured who did not personally make any misrepresentation with <u>knowledge</u> of its falsity in any application for the policy sought to be rescinded or in negations therefor, if materials outside the application are specifically referenced in the excess policies.

### F. Travelers' Fiduciary Liability Policy

Beginning in 1994, Travelers issued to HealthSouth the primary fiduciary liability policy. Federal provided excess fiduciary liability coverage with a "follow form" policy. Unlike the carriers on the D&O coverage, Travelers claims to have obtained new applications each year for the issuance of new policies. As to some insureds,[44] it seeks to rescind the policy it issued in September 2001 based on a form written application obtained from HealthSouth dated August 24, 2001 and attached to its complaint.

The application, signed by Kimberly S. McCracken, Retirement Plans Manager, contains the following provision:

> The undersigned declares that the statements set forth herein are true <u>to the best of his or her knowledge and belief</u>. The undersigned agrees that this application and attachments form the basis of the contract should a policy be issued and shall be deemed

---

[44] Travelers seeks rescission as to all the pleading defendant employees, officers, and directors; HealthSouth; Richard Scrushy, and Brandon Hale. Travelers correctly asserts that not all of the moving insureds are named as defendants to its action. Only Brandon O. Hale, John S. Chamberlain, C. Sage Givens, Joel C. Gordon, Jon F. Hanson, Robert P. May, Charles W. Newhall III, Larry D. Striplin, Jr., Phillip C. Watkins and Anthony J. Tanner are defendants in the Travelers' Complaint and of these only Hale and Watkins are named defendants in the ERISA Amended and Consolidated Complaint. *See, In re HealthSouth ERISA Litigation* (doc. # 1).

54

attached to and form a part of a policy. . . .  (Emphasis added.)

The Eleventh Circuit has held that the "best of knowledge and belief" language in an insurance application constitutes "'a different requirement of accuracy'" for purposes of rescission. *Nat'l Union Fire Ins. Co. v. Sahlen*, 999 F.2d 1532, 1536 n.5 (11th Cir. 1993) (quoting *William Penn Life Ins. Co. v. Sands,* 912 F.2d 1359, 1362-64 (11th Cir. 1990)).  In short, where the application is submitted on "knowledge and belief," the focus shifts "in determination of the truth or falsity of an applicant's statement, from an inquiry into whether the facts asserted were true to whether, on the basis of what he knew, the applicant believed them to be true." *Penn Life Ins. Co. v. Sands,* 912 F.2d 1359, 1362-64 (11th Cir. 1990)); *see also, Inglish v. United Servs. Gen. Life Co.*, 394 So. 2d 960 (Ala. Civ. App. 1980).  Courts have held that, in such circumstances, the more restrictive policy provision also limits the grounds under state law by which a carrier can rescind. *See Oliver*, 854 F.2d at 420; *United Sec. Life Ins. Co. v. Harden*, 153 So. 2d 246, 247 (Ala. 1963).  "To permit an insurer to rescind a policy containing 'knowledge and belief' language due to an unknowing misstatement not only contravenes the terms of the contract itself, but it is unfair as well." *Hauser v. Life Gen. Sec. Ins. Co.,* 56 F.3d 1330, 1334 (11th Cir. 1995).

In its brief, Travelers states that "[s]everability is not an issue with respect to Travelers' rescission count, which seeks to void the Policy only as to those insureds who made material misrepresentations leading to issuance of the Policy." Travelers' Opposition (doc. # 225), p. 17. Whether severability is an issue depends on whether Travelers correctly interprets its severability clause and other key provisions to determine which insureds in fact made material misrepresentations and to determine the standard for judging such alleged misrepresentations.

55

An endorsement changes condition (8) in the Travelers' policy to read:

> No statement in the application or knowledge or information
> possessed by an Insured shall be imputed to any other Insured for
> the purpose of determining the availability of coverage hereunder.

The policy further defines "Insured" to include the plan sponsor, HealthSouth, and its directors,

officers, and employees.  This endorsement, in fact, does make severability an issue for

Travelers' rescission action.  The court will enforce the plain language of the Endorsement and

not impute the statements in the application or the knowledge or information of an insured to any

other insured.  A basic tenet of insurance policy construction acknowledges that endorsements to

policies change and take precedence over the language of the form text.  *See* Couch on Insurance

§ 21.22 (3d ed. 1997).

The language could not be plainer.  No statement by one insured in the application can be

imputed to another insured; no knowledge of one insured can be imputed to another insured; no

information possessed by one insured can be imputed to another insured.  The effect of Condition

(8), as amended by endorsement, is that the application is construed as a separate application for

coverage by each insured.  This type of clause has been held to limit rescission "to bar coverage

only for those insureds who participated in the fraudulent inducement. . . ."  *Wedtech,* 740 F.

Supp. at 219.

The Travelers policy, similar to Federal, limits the source of information that can form

the basis of a rescission.  Condition "(8) Declarations" refers to the statements "in the

Application attached to this policy" as the basis of the company's reliance in issuing the policy.

Thus, Travelers cannot rescind based on any misrepresentations made outside of the application.

Moreover, the Travelers' application provides: "The undersigned declares that the

56

statements set forth herein are true to the *best of his or her knowledge and belief*." As discussed above, this phrase itself has the effect of altering the standards of rescission. Thus, each insured is deemed to have submitted a separate application and the statements contained therein are judged under a subjective standard, *i.e.,* whether based on what he knew the insured believed them to be true. Thus, for Travelers to seek rescission against any insured, it must establish the knowledge of the specific insured as to any alleged misrepresentations based on what that insured knew.

Travelers further argues that "knowledge and belief" language in the application does not defeat its right to rescind under Alabama Code § 27-14-7(a)(3) on the basis that it would not have issued the policy if it had known the true facts. *See* Travelers' Opposition (doc. # 225) at 18. In making this argument, however, Travelers fails to point to any language in the application or policy that met the statutory provision of § 27-14-7(a)(3) that require absolute truth and advise the insured that an innocent misrepresentation would void coverage. *See Oliver*, 658 F. Supp. at 1549-50. Therefore, this argument fails.

Travelers argues that the Eleventh Circuit has rejected the "clean heart but empty head test" it claims the insureds assert. *See* Travelers' Opposition (doc. # 225) at 19, citing *William Penn Life Ins. Co. of New York v. Sanos*, 912 F.2d 1359, 1365 (11th Cir. 1990). By adopting a subjective standard, the court does not accept the defense of an ostrich who hides his head in the sand. Even a subjective standard of knowledge can be established or disproved by objective evidence. Again, Travelers focused on the need for discovery to establish facts regarding the insureds' knowledge. The court agrees, but the need for discovery or the existence of questions regarding each insured's knowledge does not change the legal standard by which Travelers'

efforts to rescind must be judged.

The legal effect of the severability clause in the Travelers' policy is basically the same as to the D&O policies. The language of the application and endorsement changes the standard by which any alleged misrepresentations must be judged. Thus, Travelers and the excess carriers cannot rescind the fiduciary liability policies as to any insureds who did not have personal knowledge of any misrepresentation contained in the application for the specific policy.

Granted, Travelers does not seek to rescind as to all insureds. Whether it can deny coverage to any insured will depend on the facts Travelers may develop as to the knowledge of a specific insured. Also, Travelers can only deny coverage for misrepresentations contained in the application for the specific policy it seeks to rescind. *See* Travelers' policy, Conditions, (8) Declarations, quoted *supra,* and § 27-14-7(a).

### G. Applicability of the Severability Clauses to HealthSouth

### 1. The Federal D&O Stack

As set out above, the Federal policy provides specific coverage to HealthSouth as the Insured Organization. Insuring Clause 2 provides for reimbursement to HealthSouth for amounts it indemnifies an Insured Person. Insuring Clause 3, added by Endorsement 8, provides coverage to HealthSouth for all loss it is legally obligated to pay for any claim against it for a "Wrongful Act." Under Insuring Clause 3, "Wrongful Act" is defined to include any error, misstatement, etc., by any insured involving a securities transaction. The Endorsement then defines "securities transaction" to include any offer to sell any securities issued by the Insured Organization.

The securities cases filed against HealthSouth, thus, would fall within the scope of coverage of Insuring Clause 3. Federal and the excess carriers assert that no coverage exists for

58

HealthSouth because of misrepresentations made in obtaining coverage.  The prior discussion

regarding statutory requisites and the limitations imposed by the Federal representations clause,

and those of the excess carriers, apply with equal force to HealthSouth.  Thus, as a threshold

requirement, each insurer seeking to rescind its policy as to HealthSouth must demonstrate that

misrepresentations were made with knowledge of their falsity in the application or specific

documents referenced in the representations clauses of the specific policy the insurer seeks to

rescind.

The Federal severability clause, however, applies a very different standard to HealthSouth

under Insuring Clause 3, Insured Organization Coverage.  Endorsement 8 modifies the

severability clause of paragraph 17 <u>only</u> as to Insuring Clause 3.  Under that endorsement, as to

Insured Organization Coverage, all declarations statements and knowledge of any Insured Person

<u>is imputed</u> to HealthSouth for determining coverage.  The significance of this provision greatly

changes HealthSouth's rights under Insured Organization coverage from those of the insured

persons.

The language in Endorsement 8 allows the insurers to rescind coverage under Insuring

Clause 3 as to HealthSouth based upon imputation to it of statements made and knowledge

possessed by any insured person.  In its motion for partial summary judgment, HealthSouth seeks

a determination that the knowledge or conduct of people acting adverse to the company's

interests should not be imputed to HealthSouth for rescission purposes.  In support of its position,

HealthSouth cites *International Ins. Co. v. McMullan,* 1990 WL 483731 (S.D. Miss. 1990), and

*Federal Deposit Ins. Corp. v. Lott,* 460 F.2d 82 (5th Cir. 1972) (applying Texas law).

The court is not convinced that the "adverse interest" rule as argued by HealthSouth is the

law of Alabama. *See e.g.*, *Carnival Cruise Lines, Inc. v. Goodin*, 535 So. 2d 98 (Ala. 1998) (imputing knowledge from travel agent that sold vacation to plaintiff to cruise line in determining that cruise line committed fraud); *cf. General Sec. Corp. v. City of Homewood*, 67 F.2d 513, 515 (5th Cir. 1933) (refusing to apply the adverse interest rule where agents' wrongful acts benefitted the principal). Instead, Alabama has repeatedly held that the knowledge and facts of an agent acting within the line and scope of its authority are imputed to the principal. *See, e.g.,* Ala. Code § 8-2-8; *Stone v. Mellon Mortgage Co.,* 771 So. 2d 451, 457 (Ala. 2000); *American Life Ins. Co. v. Buntyn*, 148 So. 617, 620 (Ala. 1933).

The court need not decide this point because, even if the adverse interest rule were the law in Alabama, it does not protect HealthSouth in this situation where it contracted to be bound by the statements and knowledge of any insured via Endorsement 8.

Questions of fact remain regarding whether any knowing misrepresentations were actually by made in any applications for the specific policies sought to be rescinded as to HealthSouth, or in any documents specifically referenced in the excess policies. If such applications or referenced documents do contain knowing misrepresentations, then those statements by and knowledge of any insured person can be imputed to HealthSouth for purposes of determining coverage as to Insuring Clause 3. Because the law does not support the "adverse interest" theory in light of the precise policy language, and because factual questions remain, HealthSouth's motion for partial summary judgment on this point must be denied.

As to Insuring Clause 2, which provides for reimbursement to HealthSouth for sums it pays to indemnify insured persons, Endorsement 8 makes no change to the general severability clause. Thus, as to coverage to HealthSouth under Insuring Clause 2, the general severability

60

clause of paragraph 17 applies.  Because Insuring Clause 2 provides coverage to HealthSouth for

indemnification it provides to insured persons, HealthSouth's right to coverage, in essence, is

derivative of the individual insured person's right to coverage.  Under the severability clause, the

insurers cannot impute to an insured person statements or knowledge of another insured person

to deny coverage.  Similarly, the carriers cannot deny coverage to HealthSouth, or rescind

coverage under Insuring Clause 2, unless they can prove that each insured person whom

HealthSouth is obligated to indemnify made knowing misstatements in the application or specific

documents referenced in the policies sought to be rescinded.  The court concludes that the

carriers cannot rescind Insuring Clause 2 as to HealthSouth until they present such proof as to all

insured persons.

### 2. The Travelers Fiduciary Liability Policy

The language of the Travelers policy dictates a somewhat different result.  Unlike

Endorsement 8 in the Federal policy, nothing in the Travelers policy provides for imputation to

HealthSouth of any statements or knowledge by any insured.  To the contrary, the severability

provision, added by endorsement, states that "no statement . . . or knowledge or information

possessed by an Insured shall be imputed to any other Insured."  (Emphasis added.)  By

definition "Insured" includes HealthSouth as the employer who is the plan sponsor.

In its brief, the only argument Travelers makes in response to HealthSouth is that it

cannot avail itself of the adverse interest rule.  *See* Travelers' Opposition (doc. # 225) at 13-16.

GAs already stated, the court questions whether the adverse interest doctrine as articulated by

HealthSouth reflects Alabama law, and has denied HealthSouth's motion for partial summary

judgment on that point.  No further discussion of that doctrine is needed at this time.

61

Travelers does not address the applicability of its severability clause to HealthSouth.

Therefore, the court finds that by virtue of its plain policy language, no statement or knowledge

or information of any other insured can be imputed to HealthSouth.

### H. Void as to Some, But Not All?

Having concluded that the severability clauses preclude rescission of coverage as to at

least some insureds, the court has concerns about whether such determination affects the carriers'

right to rescind as to other insureds. All the insureds who briefed the issue[45] apparently assumed

that an insurance company can rescind a policy as to the insureds who participated in fraudulent

activities. The carriers who only sought to rescind as to some insureds, such as Federal and

Travelers, also made the same assumption. When questioned at the hearing about this

assumption, no one could provide the court with any authority to support it, and the court

questions the logic of that assumption.

When an insurance company rescinds a policy or declares it void *ab initio*, the result is as

if the policy never existed. As one court explained, " . . . rescission amounts to the unmaking of

the policy and is not merely a termination of the rights and obligations of the parties toward each

other, but an abrogation of all rights and responsibilities of the parties towards each other from

the inception of the policy. . ." *Bogatin v. Federal Ins. Co.*, No. 99-4441 2000 WL 804433 (E.D.

Pa.) at *25 (citation omitted). Rescission, therefore, in essence wipes out or erases the policy

from the very beginning; it never existed.

At the hearing, Judge Horn  inquired of counsel for Federal how the policy could never

---

[45] The insureds who admitted participating in the fraud that resulted in the false financial reports
on which the insurance companies rely for their rescission arguments did not participate in briefing this
issue because these proceedings were stayed as to them. *See supra* n. 7.

have existed as to some insureds, but still exist as to others. Counsel responded that such a result flowed from the severability clause. No one has cited the court any cases where this precise question has been addressed by any court. The court in *Wedtech* did not have this issue before it when it stated in *dicta* that "Federal of course retains the right to seek rescission against each and every director and officer of *Wedtech*." 740 F. Supp. at 221. A full reading of the opinion confirms that the issue before the court was "whether the policies were void *ab initio* with respect to each and every director regardless of whether he participated in the alleged fraudulent inducement." *Id.* at 219. The court concluded that they were not. *Id.* at 222.

The *Oak Industries* decisions seem to imply that a valid and enforceable policy can be rescinded as to some insureds. *Cf.* 1986 U.S. Dist. LEXIS 29699 at *10-11 (as to Oak Industries) holding that the Federal D&O policy was a valid and enforceable contract, with 1986 U.S. Dist. LEXIS 29604 at *10, stating the issue as whether Federal's complaint stated a claim against the individual insured upon which rescission of the policy can be based. The court, thus, seemed to adopt the same presumption argued here that a policy can be in force as to some insureds and void as to others, but the court never addressed that precise issue because it dismissed the claims against the individual insureds.

In short, the court has found no authority specifically addressing the issue of whether a policy can be void and nonexistent as to some insureds and at the same time valid and in force as to others. Because none of the parties briefed this assumption, the court declines to decide at this time what effects the conclusions reached in this opinion have as to any insureds who may have knowingly made material misrepresentations in the applications or materials submitted for the policies sought to be rescinded. The court does note that, if supported by evidence, the carriers

can deny coverage as to specific insureds based on misrepresentations or any number of policy exclusions.  Indeed, as previously noted, the provisions of § 27-14-7, unless weakened by policy language, are available as defenses to coverage under a valid policy.  Those defenses to coverage will be addressed at a later date.

## IV. CONCLUSIONS

The court concludes that the severability clause in the Federal D&O primary policy binds the excess carriers because none of the excess policies provide otherwise.  The Federal severability clause creates a knowledge standard for avoiding coverage based on misstatements, thus negating innocent misrepresentations as a basis for rescission.  The representations clause of the Federal policy limits the right to rescind coverage to information contained in the application, the last of which Federal received in 1994.  Some of the excess policies contain broader representations clauses, and thus their rights to rescind coverage may be based on knowing misstatements by an insured person in the documents specifically referenced in the representations clause of the specific policy.  The legal effect of the representations and severability clause precludes rescission as to all insured persons without proof of knowing misrepresentations specifically made by the insured person in a document referenced in the representations clause of the policy sought to be rescinded.

As to the Travelers Fiduciary Liability Policy, the court concludes that, based on policy language, the appropriate standard by which to judge the effect of any misstatement is the "best knowledge and belief" standard, which is a subjective standard.  The severability clause, added by endorsement, precludes imputing any statement, knowledge, or information of an insured to any other insured.  The policy also limits the source of misrepresentations to the application for

64

the policy. Thus, Travelers and the excess carriers cannot rescind as to any insured who did not make any misstatement in the application with knowledge that the statement was untrue.

The court, therefore, will grant the motions for partial summary judgment filed on behalf of the various officers and directors to the extent they seek a declaration that the policies dictate that coverage as to each insured person is determined separately and subject only to the statements and knowledge of each specific insured person, and that the policies contractually limit the right of rescission to knowing misrepresentations.

The motions of the officers and directors will be granted in part and denied in part to the extent they seek a determination that no basis for rescission lies unless a written application exists for the precise policy. The court finds instead that the provisions of § 27-14-7(a) that allows denial of recovery because of misrepresentations in an application of "negotiations therefor" has been limited by policy language. By the terms of their contract, the companies can only assert misrepresentations in the application or the specific materials referenced in their policies as a basis for rescission.

As to the motion for partial summary judgment filed by HealthSouth, that motion will be granted in part and denied in part. As to HealthSouth's request for a declaration that the doctrine of adverse interest precludes imputing knowledge of the wrongdoing agent to HealthSouth, the motion will be denied. The motion will be granted in all other respects, except that, as stated above, the insurance companies can rely on the application for the specific policy and other materials referenced in the policy as grounds for rescission.

A separate order reflecting these conclusions will be entered.

65

DONE and ORDERED this _____16th_____ day of March, 2004.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE